POELKER, MAYOR OF ST. LOUIS, ET AL. *v.* DOE

No. 75–442.   Argued January 11, 1977—Decided June 20, 1977

*Eugene P. Freeman* argued the cause for petitioners.   With him on the brief was *Jack L. Koehr*.

*Frank Susman* argued the cause and filed a brief for respondent.*

PER CURIAM.

Respondent Jane Doe, an indigent, sought unsuccessfully to obtain a nontherapeutic abortion at Starkloff Hospital, one of two city-owned public hospitals in St. Louis, Mo.  She subsequently brought this class action under 42 U. S. C. § 1983 against the Mayor of St. Louis and the Director of Health and Hospitals, alleging that the refusal by Starkloff Hospital to provide the desired abortion violated her constitutional rights. Although the District Court ruled against Doe following a trial, the Court of Appeals for the Eighth Circuit reversed in

---

*Briefs of *amici curiae* urging affirmance were filed by *Leo Pfeffer* for the American Jewish Congress et al.; and by *Sylvia A. Law, Harriet F. Pilpel,* and *Eve W. Paul* for the American Public Health Assn. et al.

Briefs of *amici curiae* were filed by *Dennis J. Horan, Dolores V. Horan,* and *Victor G. Rosenblum* for Americans United for Life, Inc.; by *Jerome M. McLaughlin* for Missouri Doctors for Life; and by *Robert E. Ratermann* for James R. Butler et al.

an opinion that accepted both her factual and legal arguments. 515 F. 2d 541 (1975).[1]

The Court of Appeals concluded that Doe's inability to obtain an abortion resulted from a combination of a policy directive by the Mayor and a longstanding staffing practice at Starkloff Hospital. The directive, communicated to the Director of Health and Hospitals by the Mayor, prohibited the performance of abortions in the city hospitals except when there was a threat of grave physiological injury or death to the mother. Under the staffing practice, the doctors and medical students at the obstetrics-gynecology clinic at the hospital are drawn from the faculty and students at the St. Louis University School of Medicine, a Jesuit-operated institution opposed to abortion. Relying on our decisions in *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), the Court of Appeals held that the city's policy and the hospital's staffing practice denied the "constitutional rights of indigent pregnant women . . . long after those rights had been clearly enunciated" in *Roe* and *Doe.* 515 F. 2d, at 547. The court cast the issue in an equal protection mold, finding that the provision of publicly financed hospital services for childbirth but not for elective abortions constituted invidious discrimination. In support of its equal protection analysis, the court also emphasized the contrast between nonindigent women who can afford to obtain abortions in private hospitals and indigent women who cannot. Particular reliance was placed upon the previous decision in *Wulff* v. *Singleton,* 508 F. 2d 1211 (CA8 1974), reversed on other grounds, 428 U. S. 106 (1976), in which the Court of Appeals

---

[1] The facts concerning Doe's visit to the hospital and the reason for her inability to obtain an abortion are hotly disputed. Our view that the Court of Appeals erred in the application of the law to the facts as stated in its opinion makes it unnecessary to describe or resolve this conflict.

had held unconstitutional a state Medicaid statute that provided benefits for women who carried their pregnancies to term but denied them for women who sought elective abortions. The court stated that "[t]here is no practical distinction between that case and this one." 515 F. 2d, at 545.

We agree that the constitutional question presented here is identical in principle with that presented by a State's refusal to provide Medicaid benefits for abortions while providing them for childbirth. This was the issue before us in *Maher* v. *Roe, ante,* p. 464. For the reasons set forth in our opinion in that case, we find no constitutional violation by the city of St. Louis in electing, as a policy choice, to provide publicly financed hospital services for childbirth without providing corresponding services for nontherapeutic abortions.

In the decision of the Court of Appeals and in the briefs supporting that decision, emphasis is placed on Mayor Poelker's personal opposition to abortion, characterized as "a wanton, callous disregard" for the constitutional rights of indigent women. 515 F. 2d, at 547. Although the Mayor's personal position on abortion is irrelevant to our decision, we note that he is an elected official responsible to the people of St. Louis. His policy of denying city funds for abortions such as that desired by Doe is subject to public debate and approval or disapproval at the polls. We merely hold, for the reasons stated in *Maher,* that the Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth as St. Louis has done.[2]

The judgment of the Court of Appeals for the Eighth Circuit

---

[2] The Court of Appeals awarded attorney's fees to respondent under the "bad faith" exception to the traditional American Rule disfavoring allowance of such fees to the prevailing party. See *Alyeska Pipeline Co.* v. *Wilderness Society,* 421 U. S. 240 (1975). It follows from our decision on the constitutional merits that it was an error to award attorney's fees to respondent.

is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE MARSHALL, see *ante*, p. 454.]

[For dissenting opinion of MR. JUSTICE BLACKMUN, see *ante*, p. 462.]

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN join, dissenting.

The Court holds that St. Louis may constitutionally refuse to permit the performance of elective abortions in its city-owned hospitals while providing hospital services to women who carry their pregnancies to term. As stated by the Court of Appeals:

"Stripped of all rhetoric, the city here, through its policy and staffing procedure, is simply telling indigent women, like Doe, that if they choose to carry their pregnancies to term, the city will provide physicians and medical facilities for full maternity care; but if they choose to exercise their constitutionally protected right to determine that they wish to terminate the pregnancy, the city will not provide physicians and facilities for the abortion procedure, even though it is probably safer than going through a full pregnancy and childbirth." 515 F. 2d 541, 544 (1975).

The Court of Appeals held that St. Louis could not in this way "interfer[e] in her decision of whether to bear a child or have an abortion simply because she is indigent and unable to afford private treatment," *ibid.*, because it was constitutionally impermissible that indigent women be " 'subjected to State coercion to bear children which they do not wish to bear [while] no other women similarly situated are so coerced,' " *id.*, at 545.

For the reasons set forth in my dissent in *Maher* v. *Roe,* *ante,* p. 482, I would affirm the Court of Appeals. Here the fundamental right of a woman freely to choose to terminate her pregnancy has been infringed by the city of St. Louis through a deliberate policy based on opposition to elective abortions on moral grounds by city officials. While it may still be possible for some indigent women to obtain abortions in clinics or private hospitals, it is clear that the city policy is a significant, and in some cases insurmountable, obstacle to indigent pregnant women who cannot pay for abortions in those private facilities. Nor is the closing of St. Louis' public hospitals an isolated instance with little practical significance. The importance of today's decision is greatly magnified by the fact that during 1975 and the first quarter of 1976 only about 18% of all public hospitals in the country provided abortion services, and in 10 States there were no public hospitals providing such services.[1]

A number of difficulties lie beneath the surface of the Court's holding. Public hospitals that do not permit the performance of elective abortions will frequently have physicians on their staffs who would willingly perform them. This may operate in some communities significantly to reduce the number of physicians who are both willing and able to perform abortions in a hospital setting. It is not a complete answer that many abortions may safely be performed in clinics, for some physicians will not be affiliated with those clinics, and some abortions may pose unacceptable risks if performed outside a hospital. Indeed, such an answer would be ironic, for if the result is to force some abortions to be performed in a clinic that properly should be performed in a hospital, the city policy will have operated to increase rather than reduce health risks associated with abortions; and in *Roe* v. *Wade,*

---

[1] Sullivan, Tietze, & Dryfoos, Legal Abortion in the United States, 1975–1976, 9 Family Planning Perspectives 116, 121, 128 (1977).

410 U. S. 113, 163 (1973), the Court permitted regulation by the State solely to *protect* maternal health.

The Court's holding will also pose difficulties in small communities where the public hospital is the only nearby health care facility. If such a public hospital is closed to abortions, any woman—rich or poor—will be seriously inconvenienced; and for some women—particularly poor women—the unavailability of abortions in the public hospital will be an insuperable obstacle. Indeed, a recent survey suggests that the decision in this case will be felt most strongly in rural areas, where the public hospital will in all likelihood be closed to elective abortions, and where there will not be sufficient demand to support a separate abortion clinic.[2]

Because the city policy constitutes "coercion [of women] to bear children which they do not wish to bear," *Roe* v. *Wade* and the cases following it require that the city show a compelling state interest that justifies this infringement upon the fundamental right to choose to have an abortion. "[E]xpressing a preference for normal childbirth," *ante*, at 521, does not satisfy that standard. *Roe* explicitly held that during the first trimester no state interest in regulating abortions was compelling, and that during the second trimester the State's interest was compelling only insofar as it protected maternal health. 410 U. S., at 162–164. Under *Roe*, the State's "important and legitimate interest in potential life," *id.*, at

---

[2] "The concentration of services among relatively few providers—mostly clinics—in the nation's larger cities is clearly associated with the failure of hospitals—especially the smaller hospitals that are the major health institutions in small cities and nonmetropolitan areas—to offer abortions along with their other health services. Since public hospitals are even less likely than private hospitals to provide abortions, it is poor, rural and very young women who are most likely to be denied abortions as a result of the need to travel outside their own communities to obtain terminations. It is these women who are least likely to have the funds, the time or the familiarity with the medical system that they need to be able to cope with the problems associated with such travel." *Id.*, at 121.

163—which I take to be another way of referring to a State's "preference for normal childbirth"—becomes compelling only at the end of the second trimester. Thus it is clear that St. Louis' policy preference is insufficient to justify its infringement on the right of women to choose to have abortions during the first two trimesters of pregnancy without interference by the State on the ground of moral opposition to abortions. St. Louis' policy therefore "unduly burdens the right to seek an abortion," *Bellotti* v. *Baird*, 428 U. S. 132, 147 (1976).

I would affirm the Court of Appeals.