432 U.S. 454
 97 S.Ct. 2394
 53 L.Ed.2d 464
 Frank S. BEAL, etc., et al., Petitioners,
v.
Ann DOE et al. Edward W. MAHER, Commissioner of Social Services of Connecticut, Appellant, v. Susan ROE et al. John H. POELKER, etc., et al., Petitioners, v. Jane DOE, etc.
 Nos. 75-554, 75-1440, and 75-442.
 June 20, 1977.
 
 On Writ of Certiorari to the United States Court of Appeals for the Third Circuit.
 On Appeal from the United States District Court for the District of Connecticut.
 On Writ of Certiorari to the United States Court of Appeals for the Eighth Circuit.
 For majority opinion of the Court, see 97 S.Ct. 2366, 2376, 2391.
 Mr. Justice MARSHALL, dissenting.
 
 
 1
 It is all too obvious that the governmental actions in these cases, ostensibly taken to "encourage" women to carry pregnancies to term, are in reality intended to impose a moral viewpoint that no State may constitutionally enforce. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Since efforts to overturn those decisions have been unsuccessful, the opponents of abortion have attempted every imaginable means to circumvent the commands of the Constitution and impose their moral choices upon the rest of society. See, e. g., Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Bellotti v. Baird, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). The present cases involve the most vicious attacks yet devised. The impact of the regulations here falls tragically upon those among us least able to help or defend themselves. As the Court well knows, these regulations inevitably will have the practical effect of preventing nearly all poor women from obtaining safe and legal abortions.[1]
 
 
 2
 The enactments challenged here brutally coerce poor women to bear children whom society will scorn for every day of their lives. Many thousands of unwanted minority and mixed-race children now spend blighted lives in foster homes, orphanages, and "reform" schools. Cf. Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). Many children of the poor, sadly, will attend second-rate segregated schools. Cf. Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). And opposition remains strong against increasing Aid to Families with Dependent Children benefits for impoverished mothers and children, so that there is little chance for the children to grow up in a decent environment. Cf. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). I am appalled at the ethical bankruptcy of those who preach a "right to life" that means, under present social policies, a bare existence in utter misery for so many poor women and their children.
 
 
 3
 * The Court's insensitivity to the human dimension of these decisions is particularly obvious in its cursory discussion of appellees' equal protection claims in Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484. That case points up once again the need for this Court to repudiate its outdated and intellectually disingenuous "two-tier" equal protection analysis. See generally Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 317, 96 S.Ct. 2562, 2568, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting). As I have suggested before, this "model's two fixed modes of analysis, strict scrutiny and mere rationality, simply do not describe the inquiry the Court has undertaken or should undertake in equal protection cases." Id., at 318, 96 S.Ct., at 2569. In the present case, in its evident desire to avoid strict scrutiny or indeed any meaningful scrutiny of the challenged legislation, which would almost surely result in its invalidation, see id., at 319, 96 S.Ct., at 2569, the Court pulls from thin air a distinction between laws that absolutely prevent exercise of the fundamental right to abortion and those that "merely" make its exercise difficult for some people. See Maher v. Roe, 432 U.S., at 471-474, 97 S.Ct., at 2381-2383. Mr. Justice BRENNAN demonstrates that our cases support no such distinction, at 485-489, 97 S.Ct., at 2388-2390, and I have argued above that the challenged regulations are little different from a total prohibition from the viewpoint of the poor. But the Court's legal legerdemain has produced the desired result: A fundamental right is no longer at stake and mere rationality becomes the appropriate mode of analysis. To no one's surprise, application of that test combined with misreading of Roe v. Wade to generate a "strong" state interest in "potential life" during the first trimester of pregnancy, see infra, at 460; Maher v. Roe, 432 U.S., at 489-490, 97 S.Ct., at 2390-2391 (BRENNAN, J., dissenting); post, at 462 (BLACKMUN, J., dissenting) "leaves little doubt about the outcome; the challenged legislation is (as) always upheld." Massachusetts Bd. of Retirement v. Murgia, supra, 427 U.S., at 319, 96 S.Ct., at 2570. And once again, "relevant factors (are) misapplied or ignored," 427 U.S., at 321, 96 S.Ct., at 2571, while the Court "forego(es) all judicial protection against discriminatory legislation bearing upon" a right "vital to the flourishing of a free society" and a class "unfairly burdened by invidious discrimination unrelated to the individual worth of (its) members." Id., at 320, 96 S.Ct., at 2570.
 
 
 4
 As I have argued before, an equal protection analysis far more in keeping with the actions rather than the words of the Court, see id., at 320-321, 96 S.Ct., at 2570, carefully weighs three factors "the importance of the governmental benefits denied, the character of the class, and the asserted state interests," id., at 322, 96 S.Ct., at 2571. Application of this standard would invalidate the challenged regulations.
 
 
 5
 The governmental benefits at issue here, while perhaps not representing large amounts of money for any individual, are nevertheless of absolutely vital importance in the lives of the recipients. The right of every woman to choose whether to bear a child is, as Roe v. Wade held, of fundamental importance. An unwanted child may be disruptive and destructive of the life of any woman, but the impact is felt most by those too poor to ameliorate those effects. If funds for an abortion are unavailable, a poor woman may feel that she is forced to obtain an illegal abortion that poses a serious threat to her health and even her life. See n.1, supra. If she refuses to take this risk, and undergoes the pain and danger of state-financed pregnancy and childbirth, she may well give up all chance of escaping the cycle of poverty. Absent day-care facilities, she will be forced into full-time child care for years to come; she will be unable to work so that her family can break out of the welfare system or the lowest income brackets. If she already has children, another infant to feed and clothe may well stretch the budget past the breaking point. All chance to control the direction of her own life will have been lost.
 
 
 6
 I have already adverted to some of the characteristics of the class burdened by these regulations. While poverty alone does not entitle a class to claim government benefits, it is surely a relevant factor in the present inquiry. See San Antonio School District v. Rodriguez, 411 U.S. 1, 70, 117-124, 93 S.Ct. 1278, 1315, 1340-1343, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting). Indeed, it was in the San Antonio case that Mr. Justice Powell for the Court stated a test for analyzing discrimination on the basis of wealth that would, if fairly applied here, strike down the regulations. The Court there held that a wealth-discrimination claim is made out by persons who share "two distinguishing characteristics: because of their impecunity they (are) completely unable to pay for some desired benefit, and as a consequence, they sustai(n) an absolute deprivation of a meaningful opportunity to enjoy that benefit." Id., at 20, 93 S.Ct., at 1290. Medicaid recipients are, almost by definition, "completely unable to pay for" abortions, and are thereby completely denied "a meaningful opportunity" to obtain them.[2]
 
 
 7
 It is no less disturbing that the effect of the challenged regulations will fall with great disparity upon women of minority races. Nonwhite women now obtain abortions at nearly twice the rate of whites,[3] and it appears that almost 40% of minority women more than five times the proportion of whites are dependent upon Medicaid for their health care.[4] Even if this strongly disparate racial impact does not alone violate the Equal Protection Clause, see Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), "at some point a showing that state action has a devastating impact on the lives of minority racial groups must be relevant." Id., at 558, 575-576, 92 S.Ct., at 1737, 1745 (Marshall, J., dissenting).
 
 
 8
 Against the brutal effect that the challenged laws will have must be weighed the asserted state interest. The Court describes this as a "strong interest in protecting the potential life of the fetus." Maher v. Roe, 432 U.S., at 478, 97 S.Ct., at 2385. Yet in Doe v. Bolton, supra, the Court expressly held that any state interest during the first trimester of pregnancy, when 86% of all abortions occur, CDC Surveillance 3, was wholly insufficient to justify state interference with the right to abortion. 410 U.S., at 192-200, 93 S.Ct., at 747-751.[5] If a State's interest in potential human life before the point of viability is insufficient to justify requiring several physicians' concurrence for an abortion, ibid., I cannot comprehend how it magically becomes adequate to allow the present infringement on rights of disfavored classes. If there is any state interest in potential life before the point of viability, it certainly does not outweigh the deprivation or serious discouragement of a vital constitutional right of especial importance to poor and minority women.[6]
 
 
 9
 Thus, taking account of all relevant factors under the flexible standard of equal protection review, I would hold the Connecticut and Pennsylvania Medicaid regulations and the St. Louis public hospital policy violative of the Fourteenth Amendment.
 
 II
 
 10
 When this Court decided Roe v. Wade and Doe v. Bolton, it properly embarked on a course of constitutional adjudication no less controversial than that begun by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The abortion decisions are sound law and undoubtedly good policy. They have never been questioned by the Court, and we are told that today's cases "signa(l) no retreat from Roe or the cases applying it." Maher v. Roe, 432 U.S., at 475, 97 S.Ct., at 2383. The logic of those cases inexorably requires invalidation of the present enactments. Yet I fear that the Court's decisions will be an invitation to public officials, already under extraordinary pressure from well-financed and carefully orchestrated lobbying campaigns, to approve more such restrictions. The effect will be to relegate millions of people to lives of poverty and despair. When elected leaders cower before public pressure, this Court, more than ever, must not shirk its duty to enforce the Constitution for the benefit of the poor and powerless.
 
 
 11
 Mr. Justice BLACKMUN, with whom Mr. Justice BRENNAN and Mr. Justice MARSHALL join, dissenting.
 
 
 12
 The Court today, by its decisions in these cases, allows the States, and such municipalities as choose to do so, to accomplish indirectly what the Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) by a substantial majority and with some emphasis, I had thought said they could not do directly. The Court concedes the existence of a constitutional right but denies the realization and enjoyment of that right on the ground that existence and realization are separate and distinct. For the individual woman concerned, indigent and financially helpless, as the Court's opinions in the three cases concede her to be, the result is punitive and tragic. Implicit in the Court's holdings is the condescension that she may go elsewhere for her abortion. I find that disingenuous and alarming, almost reminiscent of: "Let them eat cake."
 
 
 13
 The result the Court reaches is particularly distressing in Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528, where a presumed majority, in electing as mayor one whom the record shows campaigned on the issue of closing public hospitals to nontherapeutic abortions, punitively impresses upon a needy minority its own concepts of the socially desirable, the publicly acceptable, and the morally sound, with a touch of the devil-take-the-hindmost. This is not the kind of thing for which our Constitution stands.
 
 
 14
 The Court's financial argument, of course, is specious. To be sure, welfare funds are limited and welfare must be spread perhaps as best meets the community's concept of its needs. But the cost of a nontherapeutic abortion is far less than the cost of maternity care and delivery, and holds no comparison whatsoever with the welfare costs that will burden the State for the new indigents and their support in the long, long years ahead.
 
 
 15
 Neither is it an acceptable answer, as the Court well knows, to say that the Congress and the States are free to authorize the use of funds for nontherapeutic abortions. Why should any politician incur the demonstrated wrath and noise of the abortion opponents when mere silence and nonactivity accomplish the results the opponents want?
 
 
 16
 There is another world "out there," the existence of which the Court, I suspect, either chooses to ignore or fears to recognize. And so the cancer of poverty will continue to grow. This is a sad day for those who regard the Constitution as a force that would serve justice to all evenhandedly and, in so doing, would better the lot of the poorest among us.
 
 
 
 [1]
 Although an abortion performed during the first trimester of pregnancy is a relatively inexpensive surgical procedure, usually costing under $200, even this modest sum is far beyond the means of most Medicaid recipients. And "if one does not have it and is unable to get it the fee might as well be" one hundred times as great. Smith v. Bennett, 365 U.S. 708, 712, 81 S.Ct. 895, 897, 6 L.Ed.2d 39 (1961).
 Even before today's decisions, a major reason that perhaps as much as one-third of the annual need for an estimated 1.8 million abortions went unmet was the fact that 8 out of 10 American counties did not have a single abortion provider. Sullivan, Tietze, & Dryfoos, Legal Abortion in the United States, 1975-1976, 9 Family Planning Perspectives 116-117, 121, 129 (1977). In 1975, 83,000 women had to travel from their home States to obtain abortions (there were 100 abortions performed in West Virginia and 310 in Mississippi), and about 300,000 more, or a total of nearly 40% of abortion patients, had to seek help outside their home counties. Id., at 116, 121, 124. In addition, only 18% of the public hospitals in the Nation performed even a single abortion in 1975 and in 10 States not one public hospital provided abortion services. Id., at 121, 128.
 Given the political realities, it seems inevitable that the number and geographical distribution of abortion providers will diminish as a result of today's decisions. It is regrettable but likely that fewer public hospitals will provide the service and if Medicaid payments are unavailable, other
 hospitals, clinics, and physicians will be unable to do so. Since most Medicaid and public hospital patients probably do not have the money, the time, or the familiarity with the medical delivery system to travel to distant States or cities where abortions are available, today's decisions will put safe and legal abortions beyond their reach. The inevitable human tragedy that will result is reflected in a Government report:
 "(F)or some women, the lack of public funding for legal abortion acted as a deterrent to their obtaining the safer procedures. The following case history (of a death which occurred during 1975) exemplifies such a situation:
 ". . . A 41-year-old married woman with a history of 6 previous pregnancies, 5 living children, and 1 previous abortion sought an illegal abortion from a local dietician.
 Her stated reason for seeking an illegal procedure was financial, since Medicaid in her state of residence would not pay for her abortion. The illegal procedure cost $30, compared with an estimated $150 for a legal procedure . . . . Allegedly the operation was performed by inserting a metal rod to dilate the cervix . . . . (The woman died of cardiac arrest after two weeks of intensive hospital care and two operations.)" U.S. Dept. of Health, Education, and Welfare, Center for Disease Control, Abortion Surveillance, 1975, p. 9 (1977) (hereafter CDC Surveillance).
 
 
 [2]
 If public funds and facilities for abortions are sharply reduced, private charities, hospitals, clinics, and doctors willing to perform abortions for far less than the prevailing fee will, I trust, accommodate some of the need. But since abortion services are inadequately available even now, see n.1, supra, such private generosity is unlikely to give many poor women "a meaningful opportunity" to obtain abortions.
 
 
 [3]
 Blacks and other nonwhite groups are heavily overrepresented among both abortion patients and Medicaid recipients. In 1975, about 13.1% of the population was nonwhite, Statistical Abstract of the United States, 1976, p. 25, yet 31% of women obtaining abortions were of minority race. CDC Surveillance 2 and 24, Table 8. Furthermore, nonwhites secured abortions at the rate of 476 per 1,000 live births, while the corresponding figure for whites was only 277. Id., at 2, and Tables 8, 9. Abortion is thus a family-planning method of considerably more significance for minority groups than for whites.
 
 
 [4]
 Although complete statistics are unavailable (three States, Puerto Rico, and the Virgin Islands having furnished no racial breakdown, and eight States giving incomplete data), nonwhites accounted for some 43.4% of Medicaid recipients during fiscal year 1974 in jurisdictions reporting. U.S. Dept. of HEW, National Center for Social Statistics, Medicaid Recipient Characteristics and Units of Selected Medical Services, Fiscal Year 1974, p. 2 (Feb.1977). Extrapolating this percentage to cover the entire Medicaid caseload of over 17.6 million, minority racial groups would account for 7,656,000 recipients. Assuming comparability of the HEW and census figures, this amounts to 27.4% of the Nation's nonwhite population. See Statistical Abstract, supra, n. 3, at 25. Since there are 1.8 female Medicaid recipients for every male, see Medicaid Recipient Characteristics, supra, the proportion of nonwhite women who must rely upon Medicaid is probably far higher, about 38.5%. The comparable figure for white women appears to be about 7%.
 
 
 [5]
 Requirements that the abortion be performed by a physician exercising his best clinical judgment, and in a facility meeting narrowly tailored health standards, are allowable. Doe v. Bolton, 410 U.S., at 192-200, 93 S.Ct., at 747-751.
 
 
 [6]
 Application of the flexible equal protection standard would allow the Court to strike down the regulations in these cases without calling into question laws funding public education or English language teaching in public schools. See Maher v. Roe, 432 U.S., at 476-477, 97 S.Ct., at 2384. By permitting a court to weigh all relevant factors, the flexible standard does not logically require acceptance of any equal protection claim that is "identical in principle" under the traditional approach to those advanced here. See Maher, 432 U.S., at 477, 97 S.Ct., at 2384.