Jane DOE, Individually and on behalf of all others similarly situated; Dr. Dennis D. Christensen, M.D., Individually and on behalf of all others similarly situated; Rev. Jude Michaels, Individually and on behalf of the Religious Coalition for Abortion Rights; Coalition for Right to Choice, Inc., Plaintiffs,

v.

Donald H. PERCY, Secretary of Wisconsin Department of Health and Social Services, Defendant.

No. 79–C–367.

United States District Court, W. D. Wisconsin.

Sept. 13, 1979.

---

Raymond M. Dall'Osto of Wisconsin Civil Liberties Union Foundation, Inc., Milwaukee, Wis., for plaintiffs.

F. Joseph Sensenbrenner, Jr., Asst. Atty. Gen., Bronson C. La Follette, Atty. Gen., State of Wisconsin, Madison, Wis., for defendant.

James E. Brennan of Brennan, Steil, Ryan, Basting & MacDougall, Janesville, Wis., for amici curiae.

## OPINION AND ORDER

JAMES E. DOYLE, Chief Judge.

For the purpose of deciding plaintiffs' motion for a preliminary injunction, and for no other purpose, I find as fact those matters set forth hereinafter under the heading "Facts."

### Facts

Plaintiff Jane Doe is an indigent pregnant woman, who at the time she filed her complaint was in the first trimester of pregnancy. The pregnancy was the result of contraceptive failure. She is eligible for and has been receiving assistance under Wisconsin's Medical Assistance Program.

Since September, 1978 Doe has been undergoing psychiatric treatment with Dr. Keith Bogost, who has advised her that in his medical judgment, an abortion is necessary to prevent severe damage to her psychological health. Dr. Bogost has diagnosed plaintiff Doe as suffering from a depression neurosis. Doe's symptoms include suicidal feelings and threats which in Dr. Bogost's medical judgment must be taken as a serious threat to her life and health.

Dr. Bogost referred Doe to Dr. Alan Babbitz, a physician specializing in obstetrics and gynecology, and on August 11, 1979, Doe visited Dr. Babbitz and requested that he perform an abortion. Although Dr. Babbitz concurred in Dr. Bogost's judgment that an abortion was necessary to preserve Doe's health, he told Doe that under current Wisconsin and federal restrictions on funding for therapeutic abortions, he would not be reimbursed by Wisconsin's Medical Assistance Program for performing the abortion, and he declined to perform it.

The Wisconsin Statute to which Dr. Babbitz referred, Wis.Stat. § 20.927, provides Medical Assistance funds only for abortions "directly and medically necessary to save the life of the woman," or "directly and medically necessary to prevent grave, long-lasting physical health damage to the woman," or in cases in which the pregnancy is the result of sexual assault or incest. The statute denies funds for all other abortions, which in the exercise of appropriate medical judgment are deemed necessary by a doctor to prevent damage to a woman's physical or psychological health.

Plaintiff Doe has no money to pay for an abortion. Without funding under the Medical Assistance Plan, she will be unable to obtain the medical treatment which two doctors have judged necessary to prevent serious health damage.

As Secretary of the Department of Health and Social Services of the State of Wisconsin, defendant Donald Percy is charged with enforcing the abortion funding restrictions contained in Wis.Stat. § 20.-927 which have caused plaintiff's inability to obtain the abortion.

### Opinion

I.

■ Defendant contends that because the *per curiam* opinion in *Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1976) upheld an abortion funding regulation more restrictive than the one at issue here, I am foreclosed from considering the constitutionality of the funding restrictions enacted in Wis.Stat. § 20.927.[1] After analyzing the way in which the issue was framed by the lower courts in *Poelker,* and reading *Poelker* in conjunction with the related case of *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), I conclude that the Supreme Court has not yet con-

---

1. In *Poelker* the challenged policy was a mayoral directive forbidding abortions in city hospitals except when there was "a threat of grave physiological injury or death to the mother." Plaintiff also challenged the city policy of staffing the obstetrics-gynecology clinic from the faculty and students of the St. Louis University School of Medicine, a Jesuit institution opposed to abortion. *Poelker, supra,* p. 520, 97 S.Ct. p. 2392. This St. Louis policy is more restrictive than Wis.Stat. § 20.927 which provides funds for abortions meeting the St. Louis criteria as well as for abortions in cases of rape or incest.

sidered the constitutionality of a statute such as Wis.Stat. § 20.927, which excludes a large class of medically necessary abortions from a broad medical assistance plan.

The plaintiff Doe's medical need for an abortion was not an issue relevant to any of the lower court decisions in *Poelker*. Initially, the trial court dismissed the case, holding that because the plaintiff had obtained an abortion after filing her complaint, her individual case was moot and her standing to represent a class of women injured by the funding restriction had been destroyed. The Court of Appeals reversed and remanded for a trial on plaintiff's constitutional claim. *Doe v. Poelker*, 497 F.2d 1063 (8th Cir. 1974). Plaintiff's medical need or lack of need for the abortion were in no way relevant to either court's consideration of whether her termination of the pregnancy mooted the case.[2]

At the conclusion of the trial, the district court again dismissed the case without reaching the constitutional question presented. It found that plaintiff's inability to obtain an abortion had not been caused by the challenged city policy as administered by the named defendants, but by the personal unwillingness of several doctors, who had not been named as defendants, to perform an abortion which would have violated their individual ethical beliefs.[3] Thus, a determination whether plaintiff had been in medical need of an abortion was unnecessary to the district court's second decision as well as its first.

On a second appeal in *Poelker*, the Court of Appeals set aside what it regarded as the critical finding of fact by the district court, and substituted its own finding that the city policy restrictions on abortions in city hospitals, as administered by the named defendants, had caused plaintiff's injury.[4] The court then reached the constitutional issue, which it framed as follows (515 F.2d 541 at 544):

> Doe does not "demand" an abortion; but, rather, she asks that the city not deny her equal protection of the law by interfering in her decision of whether to bear a child or have an abortion simply because she is indigent and unable to afford private treatment. Stripped of all rhetoric, the city here, through its policy and staffing procedure, is simply telling indigent women, like Doe, that if they choose to carry their pregnancies to term, the city will provide physicians and medical facilities for full maternity care; but if they choose to exercise their constitutionally protected right to determine that they wish to terminate the pregnancy, the city will not provide physicians and facilities for the abortion procedure, even though it is probably safer than going through a full pregnancy and childbirth. *Roe v. Wade*, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). No rational or legally cognizable basis for this distinction is offered.

In its constitutional analysis, the court did not discuss the plaintiff's physical condition or her medical need for the abortion because it was not inquiring whether a policy

---

2. The Court of Appeals repeated plaintiff's allegation that a doctor had advised her to obtain an abortion. 497 F.2d at 1065. Because the court was ruling on the defendants' motion to dismiss, it had no occasion to find as fact any allegation of the complaint, nor was this allegation relevant to the court's decision on standing and mootness.

3. In the text, I have repeated the Court of Appeals' characterization of what the district court decided after trial. The basis of the district court opinion is not totally clear. What is clear, however, is that no facts regarding plaintiff's physical condition or medical need for the abortion were presented by the district court in support of its holding. The factual discussion

in which the trial judge did engage included three instances in which doctors at the city hospital had told Doe that no medical reason existed justifying an abortion. *Doe v. Poelker*, No. 73C565(A) (E.D.Mo., June 4, 1974).

4. In its causation discussion, the Court of Appeals engaged in factual comments about plaintiff's physical condition in conjunction with the various doctors' opinions that no medical reason existed justifying an abortion. *Doe v. Poelker, supra*, 515 F.2d at 543. The court did not make these factual comments in order to demonstrate that plaintiff was denied a medically necessary abortion. That issue was irrelevant to the causation decision.

which provides funds for maternal health care but excludes medically necessary abortions violates the Constitution. The question the Court of Appeals answered affirmatively was whether government provision of maternity care and denial of nontherapeutic abortion is an impermissible interference with a poor woman's right to decide to terminate her pregnancy for whatever reason she chooses.

This was the identical question to which the Supreme Court gave the opposite answer in its consideration of *Poelker.* In then reversing the Court of Appeals in *Poelker,* the Supreme Court did not discuss the medical condition of the plaintiff,[5] nor did it focus on the wording of the challenged St. Louis policy. Rather, the court relied entirely on the reasoning employed in *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), a companion case in which no medically necessary abortions were excluded from the program (432 U.S. at 521, 97 S.Ct. at 2392):

> . . . [T]he constitutional question presented here is identical in principle with that presented by a State's refusal to provide medicaid benefits for abortions while providing them for childbirth. This was the issue before us in *Maher v. Roe, ante,* p. 464, [97 S.Ct. 2376, 53 L.Ed.2d 484]. For the reasons set forth in our opinion in that case, we find no constitutional violation by the city of St. Louis in electing, as a policy choice, to provide

publicly financed hospital services for childbirth without providing [them] for nontherapeutic abortions.

The only significant difference between *Maher* and *Poelker* was the different method chosen by the city of St. Louis to achieve the identical goal. *Poelker* was decided by the Supreme Court on its merits only to clarify that a state's legitimate interest in "encouraging normal childbirth" can be furthered either by providing medical care for pregnancy in city hospitals while excluding nontherapeutic abortions, or by providing medical care for pregnancy in a medical assistance plan from which nontherapeutic abortions are excluded. *Poelker* applied the principle announced in *Maher.* The brevity of *Poelker* is in keeping with the subsidiary nature of the judicial task performed.

Because the Supreme Court has not yet decided upon the constitutionality of a statute which furthers a state's interest in normal childbirth by excluding certain medically necessary abortions from a broad medical assistance program, I am not foreclosed from a fresh response to the question presented by the plaintiffs in this case.[6]

## II.

Wisconsin has chosen to alleviate some of the hardships of poverty by providing medical care for "normal childbirth," by providing medical care for abortions necessary to save the life of the woman, by providing medical care for abortions directly and

---

5. In a footnote, the Court found it unnecessary to resolve what it described as "hotly disputed facts" concerning Doe's visit to the hospital and the reason for her inability to obtain an abortion. *Poelker, supra,* p. 520 n. 1, 97 S.Ct. 2391. The defendant here argues that these hotly disputed facts involved whether the plaintiff's abortion was medically necessary. But the dispute in the lower courts was who had caused plaintiff's inability to obtain an abortion, not whether her abortion was medically required. The Supreme Court found it unnecessary to resolve the causation dispute, because on either resolution of the causation issue, the Court of Appeals would have been reversed.

6. Defendant argues that the final action of the Court of Appeals in *Poelker,* after remand from the Supreme Court, constituted a decision that

a city policy excluding medically necessary abortions does not violate the constitution. Defendant asserts that "the Eighth Circuit vacated its own opinion and affirmed the district court opinion which had denied plaintiffs any relief against the limitations on public funding far more restrictive than those in *Maher* or Wisconsin law." (Defendant's Brief, p. 9.) This description is not totally accurate nor is it complete. The district court *judgment* was reinstated by the Court of Appeals. *Doe v. Poelker,* 558 F.2d 1346 (8th Cir. 1977). That judgment was a dismissal of the case on its merits. What remains of *Poelker* after remand from the Supreme Court is a judgment dismissing the case, with no supporting reasoning or analysis. That is too cryptic an outcome to serve as persuasive authority on the question presented in the instant case.

medically necessary to prevent grave, long-lasting physical health damage to the woman, by providing medical care for abortions in cases in which the pregnancy is the result of sexual assault or incest, but not by providing medical care for abortions in other cases in which an abortion is necessary, in appropriate medical judgment, for the preservation of the health of the pregnant woman. Plaintiff's claim is that Wisconsin must accord equal treatment both to childbirth and to abortion for all women who choose it when, in appropriate medical judgment, it is necessary for the preservation of their health, and that Wisconsin may not evidence a policy preference by funding only the medical expenses incident to childbirth and the medical expenses incident to abortions necessary to save the life of the pregnant woman and the medical expenses incident to abortions in only a portion of the cases in which abortions are necessary, in appropriate medical judgment, for the preservation of the health of the pregnant woman.

The preceding paragraph embodies the language of the Court in *Maher v. Roe,* 432 U.S. 464, 469–470, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), paraphrased only to describe more precisely the claim advanced in the present case. In these circumstances, as the Court observed in *Maher* (470, 97 S.Ct. 2380–2381):

> . . . [T]he manner in which [the state] dispenses benefits is subject to constitutional limitations. . . . This challenge to the classifications established by the [state] regulation presents a question arising under the Equal Protection Clause of the Fourteenth Amendment. The basic framework of analysis of such a claim is well-settled:
>
> "We must decide, first, whether [state legislation] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . .

If not, the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination . . . ." *San Antonio School District v. Rodriguez,* 411 U.S. 1, 17 [93 S.Ct. 1278, 36 L.Ed.2d 16] (1973).

The individual interest of the plaintiff Doe impaired by the challenged classification is her interest, as a pregnant woman for whom an abortion is necessary in the appropriate medical judgment of her attending physician for the preservation of her health, in making her own choice whether to terminate the pregnancy. The effect of the challenged classification is to impair this freedom of choice by influencing her decision in the direction of continuing the pregnancy, despite the resulting impairment of her health.

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Texas statutes were challenged which made it a crime to procure an abortion or to attempt one, unless by medical advice for the purpose of saving the life of the pregnant woman. It was held that within the "liberty" guaranteed by the due process clause of the Fourteenth Amendment lies a "right of privacy . . . broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.,* 153, 93 S.Ct. 727. It was held that this freedom to decide was a fundamental individual interest. *Id.,* 155–156 ff, 93 S.Ct. 705. It was also held that this freedom to decide is not "absolute," and that it "is not unqualified and must be considered against important state interests in regulation." *Id.,* 153–154, 93 S.Ct. 727. The Court held that criminal prohibitions of the Texas type violate the due process clause; that freedom to decide resides with pregnant women, in the sense that it must be left to the medical judgment of their attending physicians[7]; and that this freedom is overcome only: (a)

---

**7.** I understand this to mean that if the position of the attending physician is that an abortion is appropriate medically, the woman is free to choose either to terminate the pregnancy or not to terminate it. I will refer to this freedom hereinafter as the woman's freedom of choice, rather than the physician's.

subsequent to about the end of the first trimester, by the state's compelling interest in the health of the pregnant woman, which justifies the regulation of the abortion procedure in ways that are reasonably related to maternal health; and (b) for the stage subsequent to viability of the fetus, by the state's compelling interest in the potentiality of human life, which justifies regulation and even proscription except where abortion is necessary, in appropriate medical judgment, for the preservation of the life or health of the pregnant woman. *Id.,* 164–165, 93 S.Ct. 705.

▇ Without more, it appears that the statutory classification challenged in the present case impairs the fundamental interest of plaintiff Doe in her freedom to choose whether to terminate her pregnancy, that strict scrutiny is required, that defendant must show a compelling governmental interest in making the classification, and that defendant must show that the particular classification has been narrowly drawn to express only the legitimate state interests at stake. *Roe v. Wade,* 410 U.S. at 155, 93 S.Ct. 705. However, in *Maher v. Roe,* while "signal[ing] no retreat from *Roe* or the cases applying it," 432 U.S. at 475, 97 S.Ct. at 2383, the Court took a position and employed language which provides uncertain guidance in the judicial task I must perform in the present case.

The dominant theme in *Maher* is that, so far as the Fourteenth Amendment is concerned, there is a radical and qualitative difference between governmental programs which directly or indirectly prohibit or diminish an individual freedom, right or interest, and programs of government spending designed to give effect to the majoritarian policy preference as expressed by a legislature. This distinction is emphasized and repeated forcefully throughout the opinion. Thus, it was said in *Maher* (474, 97 S.Ct. 2382) that a state's decision to provide public funds for "childbirth" and not for "nontherapeutic abortions:"

. . . places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who

desires an abortion suffers no disadvantage as a consequence of [the state's] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. . . . [The state] has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the [state] regulation.

This strong statement then ends with the following sentence: "We conclude that the [state] regulation does not impinge upon the fundamental right recognized in *Roe [v. Wade]*."

It would surely not be unreasonable to infer from this language that the Court was holding that when a certain class of people is simply omitted from any affirmative spending program by a state, the relevant individual freedoms, rights, and interests of each of the members of that class are never affected, impaired, diminished, implicated or "impinged upon." That is to say, the concluding sentence quoted above might fairly be read as if the word "fundamental" had not been included: "We conclude that the [state] regulation does not impinge upon the right recognized in *Roe [v. Wade]*."

But this cannot have been, and was not, what the Court intended.

*Maher* was a suit brought by two indigent women who were unable to obtain a physician's certificate of medical necessity, with the consequence that one was unable to obtain an abortion and the other was being pressed to pay a bill on which the hospital had been denied Medicaid reimbursement. If these plaintiffs' right to decide to terminate their pregnancies had not been impinged upon in any way by the Connecticut Medicaid program, as administered by the defendant state Commissioner of Social Services, that would have been the end of the matter, constitutionally speaking. There would have been no need for any court to evaluate their individual interests as serious or trivial, fundamental or

nonfundamental. Nor would there have been any basis for requiring the defendant to justify the classification embodied in the program, whether by showing the existence of a compelling governmental interest or merely by showing the rationality of the classification. Yet the Supreme Court in *Maher* commenced by stating that plaintiffs' challenge "presents a question arising under the Equal Protection Clause." It set forth "the basic framework of analysis of such a claim"; that is, the need to determine whether the right impinged upon was "fundamental," requiring strict judicial scrutiny and the showing of a compelling governmental interest, or nonfundamental, requiring only that degree of judicial scrutiny necessary to determine the presence or absence of rationality. 432 U.S. at 470, 97 S.Ct. 2376. The bulk of the ensuing opinion consists of an inquiry whether it was necessary that a compelling governmental interest be shown. 432 U.S. at 471–477, 93 S.Ct. 2376. Having concluded that it need not be shown, the Court then applied, briefly, the standard of rationality (478–479, 93 S.Ct. 2385) and stated: "We *hold* that the Connecticut funding scheme satisfies this standard." (Emphasis added.) *Maher*, therefore, is a holding that when an indigent pregnant woman seeking a nontherapeutic abortion complains to a court that she has been discriminated against in violation of the equal protection clause because she has been omitted from a state program to provide medical services to indigents, she has demonstrated a sufficient impingement upon an individual interest to require a court, before rejecting her suit, to ascertain whether there is rationality in the challenged classification.

My conclusion that in *Maher* the Court acknowledged an impingement upon an individual interest of the plaintiffs is fortified by the following considerations:

(1) In *Maher* the Court observed (474, 97 S.Ct. 2383) that the state ". . . may have made childbirth a more attractive alternative, thereby influencing the woman's decision . . . ." and that ". . . indigency . . . may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions . . . ." This concession to the reality of "another world 'out there' " (Blackmun, J., dissenting, 432 U.S. at 463, 97 S.Ct. at 2373) is an acceptance that a real individual interest of the plaintiffs was impinged upon by the classification embodied in the state program.

(2) It would be unacceptable to infer that the Court intended to ignore, and even less acceptable to infer that it intended silently to erase, a significant body of law it has developed over the years, to the effect that constitutionally protected choices can be impinged upon by selectivity in the distribution of public funds. See 91 Harv.L.Rev. 70, 143–144 (1977) and cases there cited.

From the foregoing it follows that in the quoted sentence from *Maher* ("We conclude that the [state] regulation does not impinge upon the fundamental right recognized in *Roe [v. Wade]*."), the word "fundamental" not only must not be eliminated, but rather must be emphasized as a key to understanding the Court's decision. That is, in *Maher* the Court must have decided that a right recognized in *Roe v. Wade* had been impinged upon by the classification embodied in the state regulation, but that the right so impinged upon was not "fundamental."

The puzzle, then, is why the right to decide, held to be fundamental in *Roe v. Wade*, was held in *Maher* to be nonfundamental. Obviously, the answer lies somewhere in the sharp distinction drawn in *Maher* between what it considers "direct state interference with a protected activity," on the one hand, and, on the other, a state spending program to encourage individuals to exercise their right of choice in the direction preferred by a majority of the organized community.

■ In constitutional litigation it has been taken as a matter of course to inquire first into the nature and importance of the individual interest at stake and then to

inquire, whether by relatively severe or mild standards, into the nature and importance of the justification for the particular impingement upon the individual interest by the challenged governmental measure. This is to be contrasted with a process in which a court would inquire first into the nature and importance of the governmental interest to be furthered by the challenged measure and then inquire into the nature and importance of the justification for the particular impingement upon the governmental interest by the assertion of the individual interest. It is true that either process involves the balancing that must occur; that the result in either is the drawing of a line of demarcation between constitutionally protected individual interests and constitutional governmental power; that the constitutional power of government may be defined as the residue once the demarcation of limits of the constitutionally protected individual interests has been completed; and that the constitutionally protected individual interests may be defined as the residue once the demarcation of the limits of the constitutional power of government has been completed. But the starting point we have chosen for the process—the individual interest of woman, man, girl and boy—is the reflection of the essence of a free society. It is the starting point explicitly recognized in *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. 705. It is the starting point explicitly recognized as well in *Maher*, 432 U.S. at 470, 97 S.Ct. 2376, quoting from *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Despite some disconcerting language in *Maher*, it is clear that in both *Wade* and *Maher*, the Court actually engaged in that familiar and respected process of analysis which begins with the individual interest at stake. I do so now in the present case.

█ In light of *Roe v. Wade*, little need be said here of the nature and importance of the interest of the pregnant woman. If one were starting from scratch to examine in terms of life as it is lived in the real world those questions of little true importance to humans and those questions of surpassing importance and those scattered within this range, it is plain that to a woman carrying an embryo or a fetus within her, the question whether that pregnancy is to result in the birth of a child and the question how her life is to be affected by the pregnancy and perhaps by the birth of a child are questions at the highest reaches of the scale. Because the questions are intrinsically so momentous to her, it is also momentous whether she is to participate in resolving them, whether it is she who is to decide and, if so, whether she may do so independently or only with the concurrence of others. It was an appreciation of this simple truth which underlay the decision of the Supreme Court in *Roe v. Wade*, declaring fundamental the right of any pregnant woman to decide whether to terminate the pregnancy. I have no doubt that this simple truth continued to enjoy full recognition by the Court at the time *Maher* was decided.

Also, in light of *Roe v. Wade*, little need be said of the nature and importance of the community's interest in what was there described as "potential life." The Court's careful and respectful recitation of the long history of this poignantly sad controversy is itself an eloquent statement of the compassionate concern for the unborn shared by so many good women and men throughout the centuries. No community concern less noble and powerful in its appeal could have persuaded the Court to construe the Constitution to permit governmental intrusion into the woman's freedom of choice even in the final stages of pregnancy.

However, the point is that the nature and the importance of the respective interests of the pregnant woman and the organized community have been ascertained and the grave balance has been struck in *Roe v. Wade*, and struck generally in favor of women's right to choose whether to terminate pregnancies.

In the present case, as in *Maher*, the question is whether the Constitution renders this right to choose vulnerable to a level of governmental intrusion which, as *Maher* has authoritatively decided, is mild.

But in *Maher*, vulnerability to mild intrusion was tested when the right to choose was to be exercised by women whose health or life was unthreatened by continued pregnancy or childbirth. Although the nature of the individual interest at stake is constant, namely, women's right to choose whether to terminate pregnancies, the importance of that interest varies, of course, from case to case depending upon the consequences to a particular woman if abortion is removed from the choice. We have no guidance from the opinion in *Maher* itself whether the mildness of the level of intrusion, as perceived by the Court, would render it constitutionally permissible if, for example, the choice preferred by the legislative majority would mean the death of the woman.

Fortunately, however, we have explicit, and I believe controlling, guidance from the Court in its opinion in *Roe v. Wade*. From *Wade* we learn that when abortion is necessary, in appropriate medical judgment, for the preservation of the life or the health of the pregnant woman, her right to choose it can never be defeated by choice-prohibiting criminal sanctions, even in the last trimester of pregnancy when the community interest in potential life is strong enough to overcome the freedom of choice recognized in *Roe v. Wade* to reside with pregnant women generally. 410 U.S. at 164–165, 93 S.Ct. 705. So explicit and pointed is this pronouncement that it cannot be ignored or discounted when the question is whether the woman's freedom of choice is to be considered fundamental in the context of less drastic, even mild forms of intrusion. I hold that plaintiffs enjoy a strong probability of ultimate success in this lawsuit in their contention that when · evaluated against the choice-influencing classification embodied in Wis.Stat. § 20.927, the interest of plaintiff Doe in freedom to choose whether to terminate her pregnancy is fundamental, that the classification must be subjected to strict scrutiny, and that the classification can be upheld only if justified by a compelling governmental interest.

While several governmental interests in imposing the classification have been stated either by the legislature or by counsel, and others might well be articulated, it is plain that none could be considered more "compelling" than the community's interest in potential life, an interest which grows in intensity as pregnancy proceeds. I rely upon *Roe v. Wade* in assessing the probability that plaintiffs will ultimately prevail in their contention that when the right of choice is claimed by a woman whose health is threatened by a continuation of a pregnancy, the right is to be regarded as fundamental. It is that same authoritative decision, as it happens, in which it was decided that in a case like this one, the governmental interest in potential life is insufficiently compelling to override the freedom of the pregnant woman to choose abortion even in the final stages of pregnancy. I hold that plaintiffs enjoy a strong probability of ultimate success in their contention that this interest of the state in the challenged classification embodied in Wis.Stat. § 20.927 is insufficiently compelling. If this is correct, no other governmental interest could qualify as compelling.

The threatened injury to the plaintiff Doe is grievous and irreparable. No remedy at law is an adequate alternative. In light of her indigency and that of the members of the class she represents in this lawsuit, it would be unreasonable to require the posting of a bond as a condition to the issuance of a preliminary injunction.

### III.

Plaintiffs urge that the form of preliminary injunctive relief be affirmative, requiring that defendant provide public funds for abortions for plaintiff and the members of the class she represents. While stating and stressing the limits on the power of a court to grant such affirmative relief, and while vigorously opposing the grant of any form of relief, defendant observes that an affirmative injunction may prove more workable than a negative injunction.

There has been filed in this case a motion by certain persons for leave to intervene as parties defendant. While that motion re-

mains pending, they have been permitted to file an *amicus* brief in opposition to the motion for a preliminary injunction and they have done so. Insofar as the *amicus* brief raises federal constitutional arguments, those arguments have been considered in the course of the preparation of this opinion. Insofar as the *amicus* brief deals with questions of Wisconsin law, constitutional and otherwise, its arguments have not been considered. I appreciate, however, that those arguments may or may not have merit as they bear on the manner in which the state elects to respond to a preliminary injunction, whether affirmative or negative in form.

█ I have concluded that because the basis for this opinion and order is the application of the equal protection clause to a classification in the Wisconsin statutes as between medically necessary abortions and other medically necessary services to indigent pregnant women, the form of relief must be negative: that is, the state must be enjoined from providing the one category of necessary medical services unless it provides the other.

### Order

As used in this order, the following terms are defined as follows:

(a) "Recognized and legal medical providers" means all persons or institutions in Wisconsin who are certified to obtain reimbursement for medical services under the Wisconsin medical assistance program;

(b) "Wisconsin medical assistance program" means the Medicaid state-funded General Assistance and Aid to the Medically Indigent programs, established pursuant to Chapter 49 of the Wisconsin Statutes;

(c) "Indigent pregnant women" means pregnant women eligible for assistance under the Wisconsin medical assistance programs;

(d) "Medically necessary abortion" means an abortion which is necessary for the preservation of the life or the physical or mental health of a woman seeking such treatment, in the professional judgment of a licensed physician in Wisconsin, exercised in light of all factors relevant to her physical or mental health.

It is ordered that:

1. With respect to members of the class certified by separate order today, effective thirty days from the date of entry of this order, defendant Percy, his successors, agents, employees and all persons in active concert with him are preliminarily enjoined from making payments under Wisconsin's Medical Assistance Plan to any recognized and legal medical provider or to any indigent pregnant woman for any medical services relating to pregnancy unless defendant also provides funds for all medically necessary abortions for members of the class, in the same manner and under the same procedures applicable to reimbursement for pregnancy related medical care.

2. With respect to the named plaintiff Doe, in the event a recognized and legal medical provider requests reimbursement from Wisconsin's Medical Assistance Program for an abortion performed upon Doe, defendant Percy, his successors, agents, employees and all persons in active concert with him are preliminarily enjoined from making payments for any medical services relating to pregnancy unless the provider requesting reimbursement for Doe's abortion is either reimbursed or denied reimbursement in the same manner and under the same procedures by which providers requesting reimbursement for pregnancy related medical care are either reimbursed or denied reimbursement.