614 F.2d 585
 REPRODUCTIVE HEALTH SERVICES, Robert H. Duemler, M. D., Appellants,
Michael Freiman, M. D.
v.
David R. FREEMAN, Director, State of Missouri Department of
Social Services, and Phyllis J. Reser, Director,
Department of Social Services, Division
of Family Services, State of
Missouri, Appellees.
REPRODUCTIVE HEALTH SERVICES, Robert H. Duemler, M. D., Appellees,
Michael Frieman, M. D.
v.
David R. FREEMAN, Director, State of Missouri Department of
Social Services, and Phyllis J. Reser, Director,
Department of Social Services, Division
of Family Services, State of
Missouri, Appellants.
 Nos. 79-1275, 79-1346.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 8, 1979.
Decided Jan. 9, 1980.
 
 Frank Susman, Susman, Schermer Rimmel & Parker, St. Louis, Mo. (argued), Susman also made rebuttal and Leland M. Shurin, Horowitz & Shurin, Kansas City, Mo., on brief, for appellant, Reproductive Health Services, et al.
 Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, Mo. (argued) and John Ashcroft, Atty. Gen., Jefferson City, Mo., on brief, for appellees, David R. Freeman, etc., et al.
 David C. Drury, St. Louis, Mo., on brief, for amicus curiae, Lawyers for Life, Inc. and Missouri Citizens for Life.
 Before ROSS and STEPHENSON, Circuit Judges, and McMANUS,* District Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 At issue is the validity of a Missouri medical assistance regulation that makes public subsidy of abortions available only where a full-term pregnancy and childbirth would cause the death of the mother. The district court[1] held the regulation invalid on the basis that it conflicted with the Federal Medicaid Act (Title XIX). The court further held, however, that Missouri could legally refuse to subsidize abortion expenses for which it would receive no federal reimbursement under the Hyde Amendment.[2] The court then determined that Missouri's abortion subsidy scheme, when made consistent with Title XIX as affected by the Hyde Amendment, was constitutionally permissible. The court awarded attorneys' fees to plaintiffs. We affirm the result of the court's statutory holdings and its award of attorneys' fees, but reverse its holding that Missouri can constitutionally withhold subsidies for all non-Hyde Amendment abortions.
 
 I. Background
 
 2
 Missouri receives federal aid under the Federal Medicaid Act, Title XIX of the Social Security Act of 1965. Missouri uses this federal aid, supplemented by its own funds, to help its needy meet the expenses of several medical services. Through its Division of Family Services,[3] Missouri subsidizes hospital care, out-patient care, physicians' services, and family planning. Mo.Ann.Stat. § 208.152 (Vernon Supp.1979). By regulation 13 C.S.R. § 40-81.100, however, Missouri has provided:
 
 
 3
 (1) The Division of Family Services shall expend federal and state funds for physician and hospital services for abortions only where an abortion is medically indicated.
 
 
 4
 (2) "Medically indicated" shall mean where the attending physician in the exercise of his best clinical, medical judgment believes a fullterm pregnancy and childbirth would cause cessation of the mother's life.
 
 
 5
 (3) The attending physician shall certify to the director, the Division of Family Services, his medical diagnosis that a fullterm pregnancy and childbirth would cause cessation of the mother's life.
 
 
 6
 (4) The attending physician shall submit to the director of the Division of Family Services the patient's written consent to the abortion; such consent shall contain an affirmative statement that her consent is informed and freely given and is not the result of coercion.
 
 
 7
 Plaintiffs (physicians and a medical clinic financially injured by the regulation) sought declaratory and injunctive relief on the ground that 13 C.S.R. § 40-81.100 was unconstitutional under the fourteenth amendment.[4] Plaintiff Duemler is a physician who performs abortions for patients who qualify for Missouri Medicaid assistance. Duemler is a part-time employee of plaintiff Reproductive Health Services (Reproductive), an organization that operates an out-patient, first-trimester abortion facility. During 1976, Missouri Medicaid subsidized 2400 abortions, 1824 of which were performed at facilities provided by Reproductive, 166 of which were personally performed by Duemler. Most of these abortions were, in Duemler's medical judgment, medically necessary in light of all the factors that he considers relevant to the patient's well-being: the patient's physical, emotional, psychological, and familial circumstances, and the patient's age. Duemler believes that virtually none of the abortions he performs could be justified as necessary to save the patient's life.
 
 
 8
 With the promulgation of 13 C.S.R. § 40-80.100, the number of Medicaid recipients seeking abortions at Reproductive declined from 177 to 67 per month. In the last year, counsel inform us, the number of Medicaid abortions in Missouri has fallen to zero.
 
 
 9
 Both parties below moved for summary judgment, with physicians submitting supporting affidavits. Although the affidavits reflect philosophical differences as to the desirability of abortion,[5] we perceive no genuine medical dispute as to the following. There are situations in which a physician considers an abortion medically indicated or medically necessary even though a full-term pregnancy will not cause death.[6] Abortion may be medically necessary where the patient has genital cancers, proliferative retinopathy (retina disease), or nephropathy (kidney disease). In any of these cases, an abortion might be necessary to preserve the patient's health, yet only in an extremely rare situation could a physician accurately state that the life of the pregnant patient would be endangered if the pregnancy were to continue to term.[7]
 
 II. Statutory Questions
 A. The Effect of Title XIX
 
 10
 The district court, relying on Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979), held that Missouri's policy of subsidizing only life-saving abortions was superseded by Title XIX, specifically 42 U.S.C. § 1396a(a)(17) and 42 C.F.R. § 440.230 (1978). This conclusion is consistent with our decision today in Hodgson v. Board of County Commissioners, 614 F.2d 601 (8th Cir. 1980), and we reject the bulk of defendants' arguments for the reasons expressed there.
 
 
 11
 Defendants raise three points, however, that were not raised in Hodgson.[8] First, defendants argue that we must reverse the district court because the issue of Title XIX's requirements was not raised by plaintiffs below. The complaint brought exclusively constitutional challenges to 13 C.S.R. § 40-80.100, and the only statutory issue the court requested the parties to brief concerned the effect of the Hyde Amendment, which proscribes federal spending for most abortions.
 
 
 12
 Nevertheless, we do not believe defendants were justified in believing that the constitutionality of 13 C.S.R. § 40-80.100 was the only issue before the court. In responding to the court's request to discuss the Hyde Amendment, the plaintiffs asserted the inconsistency of 13 C.S.R. § 40-80.100 with Title XIX. This occurred several months before the court's decision and defendants offer nothing to upset our presumption that they had adequate opportunity to respond. Cf. Fed.R.Civ.P. 15(b) (issues not pleaded but tried by implied consent are treated as if pleaded). Moreover, the constitutional challenge necessarily brought the interpretation of Title XIX into question. Interpreting Title XIX to require subsidy of medically necessary abortions a possibility explicitly raised by the Supreme Court one month before plaintiffs' complaint, Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) would have made a constitutional argument unnecessary to consider. See Ashwander v. TVA, 297 U.S. 288, 346-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (courts traditionally prefer statutory to constitutional grounds). We therefore think the defendants were placed on notice that Title XIX's scope was being drawn into question.
 
 
 13
 A more substantial contention is that the Congress which enacted Title XIX could not have intended to require states to subsidize abortions because at the time of Title XIX's enactment, in 1965, most states criminally proscribed all but life-saving abortions.[9] Defendants rely on dictum in Beal v. Doe, supra, which considered it "relevant" that:
 
 
 14
 (W)hen Congress passed Title XIX in 1965, nontherapeutic abortions were unlawful in most States. In view of the then-prevailing state law, the contention that Congress intended to require rather than permit participating States to fund nontherapeutic abortions requires far more convincing proof than (plaintiffs) have offered.
 
 
 15
 Id. at 447, 97 S.Ct. at 2372 (footnote omitted).
 
 
 16
 Although one federal district court has cited this language in Beal in support of defendants' proposition that Title XIX also permits a state to withhold subsidies for therapeutic abortions, D. R. v. Mitchell, 456 F.Supp. 609, 622 (D.Utah 1978) we do not find defendants' argument persuasive. First, Beal expressly did not contemplate Title XIX's requirements concerning therapeutic services. 432 U.S. at 444-45, 97 S.Ct. 2366. Second, Beal 's language, when applied to therapeutic services, leads to the absurd result that Title XIX permits a participating state to withhold subsidies for any service, no matter how medically necessary, that was not legally available in 1965. We doubt that the Supreme Court would tolerate, for example, a Title XIX state's refusal to subsidize a medically essential prescription drug on the ground that it was not approved until after 1965. Excluding a form of medical service not because of the recipient's medical need, but solely because it was once not legally available, would contravene Title XIX's express directive that standards governing the extent of medical assistance be reasonable. 42 U.S.C. § 1396a(a) (17). We therefore believe that the Congress which enacted Title XIX intended to require that persons otherwise eligible under a state plan receive all medical services legally available at the time they are needed.
 
 
 17
 Finally, defendants emphasize the formal approval by the Department of Health, Education and Welfare (HEW) of a previous Missouri Medicaid regulation, which stated that "(p)ayment is not made for abortions unless a licensed physician certifies to the Division of Family Services that continuation of the pregnancy will endanger the mother's life."
 
 
 18
 Defendants urge that 13 C.S.R. § 40-81.100, which has not yet been approved by HEW, is sufficiently similar to the prior regulation to invoke in its favor the rule that "(t)he construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' NLRB v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 ((1944))." Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).
 
 
 19
 Assuming that HEW would approve 13 C.S.R. § 40-81.100, which appears significantly more restrictive than its predecessor, we cannot give the HEW interpretation much weight here. As the Supreme Court also stated in Volkswagenwerk, "the courts are the final authorities on issues of statutory construction, and 'are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " Id. (citation omitted). In light of Title XIX's mandate that medical assistance be disbursed in accordance with reasonable standards of medical need, HEW's approval of a statutory scheme that alters its general standard of medical need with respect to a particular medically necessary procedure deserves little deference.
 
 
 20
 For the reasons stated here and in Hodgson v. Board of County Commissioners, supra, we again hold that Title XIX, as originally enacted, forbids a participating state to single out abortion subsidies for a more restrictive standard of medical need.
 
 B. The Effect of the Hyde Amendment
 
 21
 The district court, after ruling that 13 C.S.R. § 40-80.100 was inconsistent with Title XIX, next considered whether Title XIX was substantively amended by the Hyde Amendment, Act of Oct. 18, 1978, Pub.L.No. 95-480, § 210, 92 Stat. 1586, which read:
 
 
 22
 None of the funds (appropriated for the use of HEW) shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest has been reported promptly * * *; or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.[10]
 
 
 23
 The district court held that this language altered Missouri's abortion subsidy obligations under Title XIX.
 
 
 24
 This holding comports with the interpretation given the Hyde Amendment by the First Circuit in Preterm, Inc. v. Dukakis, supra, and the Seventh Circuit in Zbaraz v. Quern, 596 F.2d 196 (7th Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3013 (U.S. July 24, 1979) (No. 79-64), which we followed in Hodgson v. Board of County Commissioners, supra.[11] We have examined plaintiffs' criticisms of the Preterm-Zbaraz rationale and find them unpersuasive for the reasons expressed in Hodgson.[12] We therefore affirm the district court on its Hyde Amendment holding.
 
 III. The Constitutional Issue
 
 25
 The district court's final holding was that Missouri's policy of excluding medically necessary non-Hyde Amendment abortions from its medicaid coverage was constitutional. The court first observed that:
 
 
 26
 The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents. But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations.
 
 
 27
 Maher v. Roe, 432 U.S. 464, 469-70, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977). The court then analyzed the Missouri exclusion under the traditional equal protection analysis described in San Antonio School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973):
 
 
 28
 (A court) must decide, first, whether (the policy) operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. * * * If not, the (policy) must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination * * *.
 
 
 29
 The court decided that strict scrutiny was inappropriate because the exclusion neither disadvantaged a suspect class nor impinged upon a fundamental right, and determined that the exclusion was valid because it rationally furthered Missouri's "strong and legitimate interest in encouraging normal childbirth" and in "protecting the potential life of the fetus" (citing Maher v. Roe, supra, 432 U.S. at 478, 97 S.Ct. at 2385).
 
 
 30
 The district court's is one of at least six recent federal decisions to have considered whether a state violates the Equal Protection Clause when it excludes medically necessary non-Hyde Amendment abortions from its medicaid program. In Doe v. Percy, 476 F.Supp. 324 (W.D.Wis.1979), the court granted preliminary injunctive relief to the exclusion's challengers. The court held there was a strong likelihood that Wisconsin's payment of pregnancy expenses combined with its nonpayment of medically necessary abortion expenses would trigger strict scrutiny and that the state's classification could not be justified by a compelling state interest. In Zbaraz v. Quern, 469 F.Supp. 1212 (N.D.Ill.1979), review granted, juris. postponed, --- U.S. ----, 100 S.Ct. 447, 62 L.Ed.2d 376 (U.S.1979), the court concluded that strict scrutiny did not apply but nonetheless struck down Illinois' medicaid exclusion (and the Hyde Amendment)[13] for failure to further a legitimate governmental interest. In D.R. v. Mitchell, 456 F.Supp. 609 (D.Utah 1978), however, the court upheld Utah's medicaid exclusion on the basis that it reasonably advanced the state's legitimate interest in promoting childbirth. Accord, Doe v. Mundy, 441 F.Supp. 447 (E.D.Wis.1977) (upholding constitutionality of county hospital rule permitting use of hospital facilities for abortion only where continuation of pregnancy threatens life of mother). And an early version of the Hyde Amendment withstood a constitutional attack in Woe v. Califano, 460 F.Supp. 234 (S.D.Ohio 1978).
 
 
 31
 As these decisions indicate, an equal protection challenge to Missouri's policy can be characterized in at least two ways. The favored class can be characterized as (1) those pregnant indigents who seek either childbirth or a Hyde Amendment abortion or (2) those indigents who seek medically necessary procedures other than abortions. In both cases the disfavored class would comprise those pregnant indigents who seek medically necessary non-Hyde Amendment abortions.[14] We conclude that, under either characterization, Missouri's legislative classification must fall as violative of the fourteenth amendment.[15]
 
 
 32
 We consider first the classification made among the pregnant poor. We agree with the district court that Missouri's medicaid policy disfavoring certain pregnant indigents does not disadvantage a suspect class. Maher v. Roe, supra, 432 U.S. at 471, 97 S.Ct. 2376 (indigency alone does not make a class suspect); cf. Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) (pregnancy-based classifications are not tantamount to suspect sex-based classifications).
 
 
 33
 Whether the Missouri medicaid exclusion impinges upon a fundamental right is, as the district court acknowledged, a "closer question," and requires some understanding of the Supreme Court's decisions in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Maher v. Roe, supra.
 
 
 34
 In Roe v. Wade, the Supreme Court recognized that a pregnant woman's interest in deciding to terminate her pregnancy through an abortion instead of through childbirth has the status of a "fundamental right" under the Constitution, and that any state impairment of that interest through criminal sanctions must be justified by a compelling state interest.[16] Although acknowledging that the state had potentially compelling interests at stake such as protecting the pregnant woman's health after the first trimester of pregnancy and protecting fetal life after the point of fetal viability the Court in Wade invalidated the state criminal statute before it on the basis that it broadly proscribed abortions (except for life-saving abortions) without regard for the woman's fundamental interest in the abortion choice.
 
 
 35
 In Maher v. Roe, the Court applied a more lenient "rational basis" standard in upholding a state's policy of subsidizing childbirth while refusing to subsidize nontherapeutic abortions. The Court explained that "the right in Roe v. Wade can be understood only by considering both the woman's interest and the nature of the State's interference with it." 432 U.S. at 473, 97 S.Ct. at 2382. The woman's interest in Maher was not as substantial as the woman's interest in Wade. Wade catalogued the detriments suffered by a woman denied her choice of abortion:
 
 
 36
 Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved.
 
 
 37
 410 U.S. at 153, 93 S.Ct. 705, 727. Only a portion of these detriments was suffered by the Maher plaintiffs, who were unable to obtain a physician's certificate that for them abortion was a medical necessity. Moreover, the form of the state interference in Maher was not as substantial as the criminal proscription involved in Wade. The Maher Court found "a basic difference between direct state interference with a protected activity (as in Wade ) and state encouragement of an alternative activity consonant with legislative policy (as in Maher )." 432 U.S. at 475, 97 S.Ct. at 2383. Under this analysis, the Maher Court concluded that even though the state policy of subsidizing childbirth while refusing to subsidize non-therapeutic abortions may influence the woman's constitutionally protected independent decision to seek an abortion, id. at 474, 97 S.Ct. 2376, its classification triggered only a "reasonable basis" scrutiny. Applying this test, the Court reasoned that the state's classification reasonably furthered its legitimate interest in "encouraging normal childbirth." Id. at 479, 97 S.Ct. 2376.
 
 
 38
 The case here differs from both Wade and Maher. Here, like Wade and unlike Maher, the woman's fundamental interest in seeking an abortion is magnified by her interest in preserving her own health, an interest which may itself be fundamental.[17] The potential effect of the state's policy is therefore to subject to the full spectrum of detriments catalogued in Wade, supra, 410 U.S. at 153, 93 S.Ct. 705, those pregnant poor who are denied medically necessary abortion benefits. To be sure, withholding medicaid benefits is not a direct interference. Still, the differential disbursement of government benefits deemed medically necessary is apt to have a strong influence on those who, by hypothesis, are unable to procure them through their own means.
 
 
 39
 (I)t is at least clear that medical care is as much "a basic necessity of life" to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements.
 
 
 40
 Memorial Hospital v. Maricopa County, 415 U.S. 250, 259, 94 S.Ct. 1076, 1082, 1083, 39 L.Ed.2d 306 (1974) (footnote omitted). Cf. Singleton v. Wulff, 428 U.S. 106, 118-19 n. 7, 96 S.Ct. 2868, 2876 n. 7, 49 L.Ed.2d 826 (1976) ("For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an 'interdiction' of it as would ever be necessary.")[18]
 
 
 41
 In declaring that there is a "basic difference" between direct interference with an activity, on the one hand, and discouragement of that activity through the subsidy of an alternative activity, on the other, the Maher Court laid down no per se rule. While the Court emphasized that the form of the state interference was significant in determining whether it impinged upon a fundamental right, the Court did not make the form of interference determinative.[19] Rather, in focusing on not only the form of state interference but also the woman's interest, 432 U.S. at 473, 97 S.Ct. 2376, the Court recognized that the ultimate test of whether constitutionally protected interests are being impinged upon is not simply the form that the state interference takes but the effect that the interference exerts. The effect here, because significantly more substantial than that present in Maher, calls for judicial scrutiny that demands more than "minimal rationality."
 
 
 42
 Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny.
 
 
 43
 Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 49 (1972).
 
 
 44
 To justify Missouri's medicaid exclusion for medically necessary non-Hyde Amendment abortions, defendants assert the state's interest in protecting fetal life.[20] Yet the Missouri subsidy scheme does not pursue that interest at all costs. The initial scheme authorized expenditure for life-saving abortions. And we have affirmed the district court's holding that Missouri's policy of excluding all non-life-saving abortions from its medicaid program is superseded by Title XIX as modified by the Hyde Amendment, meaning that Missouri must now also subsidize medically necessary abortions to terminate pregnancies that result from rape or incest.[21] Missouri presumably will continue to withhold subsidies for medically necessary abortions generally, which the Hyde Amendment permits it to do.
 
 
 45
 The resulting subsidy scheme seems to represent an attempt to harmonize the state's interest in protecting fetal life with the state's interest in the health of its pregnant poor. Assuming that protecting fetal life is a constitutionally permissible interest where a medically necessary abortion is concerned a point we address later, infra at 597-600 we hold that the Missouri subsidy scheme fails rationally to promote that interest.
 
 
 46
 The Missouri scheme is irrationally underinclusive in that it generally denies subsidies to indigent women seeking medically necessary abortions but extends subsidies for medically necessary abortions to those indigent women whose pregnancies have resulted from rape or incest. In terms of either protecting fetal life or preserving the patient's health, there is no rational distinction between the woman who wants a medically necessary abortion because of rape or incest and the woman who wants such an abortion simply because she needs it to preserve her health. The Equal Protection Clause denies
 
 
 47
 to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920).
 
 
 48
 Reed v. Reed, 404 U.S. 71, 75-76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). If Missouri is to subsidize medically necessary abortions for indigent women who are pregnant due to rape or incest, as it must under Title XIX, it must also subsidize medically necessary abortions generally in order to avoid invidious discrimination against those indigent women who are not victims of rape or incest. Cf. Police Department of Chicago v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (anti-picketing law's exception for peaceful labor picketing invalid under Equal Protection Clause because exception not rational in terms of state interest in regulating picketing's time, place and manner).
 
 
 49
 It is unnecessary to decide the rationality of adopting a former Hyde Amendment exception, in effect at the time this action was brought and decided in the district court, which permits abortion subsidy only if there will be severe and long-lasting health damage that is "physical" and that is prognosticated by two physicians. We do note, however, that the presumption that physical health detriments are deserving of attention but that mental health detriments uniformly are not is, in one court's opinion, "nothing less than absurd." Preterm, Inc. v. Dukakis, supra, 591 F.2d at 132. Moreover, no Supreme Court decision has countenanced a distinction drawn between abortions performed for physical health reasons only and abortions performed for mental health reasons.[22] We also observe that any two-physician-determination requirement would be suspect in light of Doe v. Bolton, 410 U.S. 179, 199-200, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The factual setting of Doe was different, of course, but its language suggests that the instant two-physician requirement could survive under only the barest of minimal rationality standards.
 
 
 50
 We conclude, on the basis of the rape and incest exception, that Missouri's subsidy scheme, made to conform with Title XIX as altered by the Hyde Amendment, fails to promote, along rationally drawn lines, the state interests in protecting fetal life and preserving maternal health. Regardless of the appropriate level of scrutiny and we have indicated our belief that some standard more stringent than a rational basis test is appropriate here the Missouri subsidy scheme does not survive an equal protection attack.
 
 
 51
 This is not the only analysis under which the Missouri scheme is unconstitutional. In Zbaraz v. Quern, 469 F.Supp. 1212 (N.D.Ill.1979), review granted, juris. postponed, --- U.S. ----, 100 S.Ct. 447, 62 L.Ed.2d 376 (U.S.1979), the district court characterized an Illinois medicaid classification as one between indigents seeking medically necessary non-Hyde Amendment abortions and indigents seeking medically necessary procedures generally. The classification did not impinge upon a fundamental interest and was therefore subject only to the requirement that it rationally further a legitimate, articulated state purpose. The court assumed, as we have not, that the classification's relationship to the goal of protecting fetal life was sufficiently rational. But the court held that the classification's goal of protecting fetal life was not legitimate, at least where the fetus was not viable: "a state has (no) legitimate interest in promoting the life of a nonviable fetus in a woman for whom an abortion is medically necessary." Id. at 1219.
 
 
 52
 We substantially concur with this analysis, but perceive no support for a viable/non-viable distinction in the context of funding medically necessary procedures under Title XIX. We conclude that, regardless of the stage of pregnancy, a state has no constitutionally permissible interest in promoting the life of the fetus in a woman for whom an abortion is medically necessary to preserve health or life.
 
 
 53
 This conclusion follows the teachings of all relevant abortion decisions of the Supreme Court. The first case to intimate the relative weights of the state's interests in protecting fetal life and preserving the woman's health was Roe v. Wade, supra. Roe recognized the interest in fetal life as constitutionally permissible but concluded that it did not become "compelling," and thus sufficient to justify restrictions on abortions, until the point of viability when the fetus would be able to survive outside the mother's womb. 410 U.S. at 163, 93 S.Ct. 705. Even at this point, however, the state may not go so far as to proscribe abortion "when (abortion) is necessary to preserve the life or health of the mother." Id. at 164, 93 S.Ct. at 732 (emphasis added).[23]
 
 
 54
 The Court thus strongly implied that the state's interest in preserving the pregnant woman's health presumably derived from the woman's own interest in preserving her health was necessarily stronger than the state's interest in protecting fetal life. Although Roe arose in the context of abortion regulation, and not abortion funding, the lesson remains the same: whatever steps the state takes to promote its interest in protecting fetal life cannot be taken at the expense of the woman's health. The interest in protecting fetal life is thereby qualified, and might be better termed as an interest in encouraging "normal childbirth." Childbirth is "abnormal," under this term of art, when it poses, relative to abortion, a significant threat to the health or life of the mother. See Roe v. Wade, supra, 410 U.S. at 149, 93 S.Ct. 705.
 
 
 55
 This interpretation is consonant with the Court's carefully drafted opinions in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), Maher v. Roe, supra, and Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). In each case the Court upheld government policies that withheld aid for abortions that the Court consistently defined as non-therapeutic.[24] In each case the withholding was justified by the state's interest in "encouraging normal childbirth." Poelker v. Doe, supra, 432 U.S. at 521, 97 S.Ct. 2391; Maher v. Roe, supra, 432 U.S. at 478, 97 S.Ct. 2376; Beal v. Doe, supra, 432 U.S. at 446, 97 S.Ct. 2366.
 
 
 56
 The view that there is no legitimate state interest in promoting fetal life at the expense of maternal health is also supported by the Court's disposition in Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). The Court in Danforth invalidated Missouri's statutory requirement that saline amniocentesis could not be used as an abortion technique after the first trimester of pregnancy. This requirement did not preclude abortions altogether, but available alternative abortion techniques were "significantly more dangerous and critical for the woman than the saline technique." Id. at 76, 96 S.Ct. at 2844. The requirement was therefore not reasonably related to the state's interest in promoting maternal health; rather, it was "designed to inhibit, and (had) the effect of inhibiting, the vast majority of abortions after the first 12 weeks." Id. at 79, 96 S.Ct. at 2845. It thus promoted fetal life, although the Court did not cast the matter in those terms. In invalidating the requirement, the Court strongly indicated that a state cannot elevate its interest in encouraging childbirth above its interest in maternal health.
 
 
 57
 That implication was made once more in Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), decided last Term. The Court in Colautti invalidated for vagueness a Pennsylvania criminal statute that required any physician who performed an abortion to exercise due care to preserve fetal health and life "so long as a different (abortion) technique would not be necessary in order to preserve the life or health of the mother." Id. at 397, 99 S.Ct. at 687. The statute as a whole failed to make clear whether it permitted the physician to prefer the woman's life and health to the fetus' life and health when they conflicted or whether it required the physician to accept greater risks to maternal health in order to increase the likelihood of fetal survival. Id. at 400, 99 S.Ct. 675. The Court declared that the latter requirement would create "(s)erious ethical and constitutional difficulties." Id. We think this statement is a pointed, if not wholly unambiguous, reaffirmation of the principle that a state may not promote fetal life at the expense of maternal health.
 
 
 58
 We therefore rule that Missouri's medicaid exclusion for therapeutic non-Hyde Amendment abortions is invalid under the Equal Protection Clause not only because it invidiously discriminates against the pregnant and medically needy who are not victims of rape or incest, but also because it singles out for exclusion one procedure medically necessary to preserve health without furthering a legitimate state interest in doing so. The interest promoted by the exclusion protecting fetal life is not a constitutionally permissible objective when the pregnant woman's life or health is at stake.
 
 
 59
 Although we are naturally reluctant to overturn legislation on the basis that it furthers no legitimate state interests, the signals from the Supreme Court's abortion decisions are strong. Here, as elsewhere, there are governmental goals which, while salutary in themselves, simply cannot be promoted, no matter how rational the means, at the expense of weightier interests. Cf., e. g., Zablocki v. Redhail, 434 U.S. 374, 395, 98 S.Ct. 673 (Stewart, J., concurring in the judgment) (state's legitimate concern with financial soundness of prospective marriage "must stop short" of denying marriage licenses to individuals because they are too poor). Moreover, even were we writing on a clean slate, we would be constrained to find that this is an area in which sensitive judicial review is particularly appropriate. The minority disadvantaged by Missouri's medicaid exclusion is sex-specific and financially destitute; and legislative arguments disfavoring abortion tend to draw heavily on religious assumptions, see Roe v. Wade, supra, 410 U.S. at 150, 160-62, 93 S.Ct. 705; Tribe, The Supreme Court 1972 Term Foreword: Toward a Model of Roles in the Due Process of Life and Law, 87 Harv.L.Rev. 1, 20-25 (1973); cf. United States v. Vuitch, 402 U.S. 62, 78-80 & nn. 1, 2, 91 S.Ct. 1294, 28 L.Ed.2d 601 (White, J., concurring). These factors suggest "a special condition which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." United States v. Carolene Products, 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 784 n. 4, 82 L.Ed. 1234; see L. Tribe, American Constitutional Law 929-30, 1071 n. 6 (1978). Any strong deference to the legislative process seems especially inapt where the minority asserts not only the fundamental interest in deciding whether to bear a child, which was the case in Maher, but the additional interest in preserving one's own health. Thus, although the Maher Court counseled deference to the legislative process where the funding of nontherapeutic abortions is concerned, 432 U.S. at 479-80, 97 S.Ct. 2376, there obviously is a point at which judicial intervention in the abortion controversy is appropriate. See generally Roe v. Wade, supra. We believe that point is reached when a state singles out therapeutic abortions for exclusion from its medicaid program for the poor.
 
 
 60
 Defendants and amici contend that requiring subsidy for therapeutic abortions will subvert the Supreme Court's holdings in Maher v. Roe, supra, and Poelker v. Doe, supra, by permitting physicians to certify as therapeutic abortions that are in fact purely elective. Whether our holding will be subject to this abuse we cannot portend. Remedies for abuse lie both within the medical profession and in Title XIX, 42 U.S.C. § 1396h. See generally Roe v. Wade, supra, 410 U.S. at 166, 93 S.Ct. 705; Zbaraz v. Quern, supra, 469 F.Supp. at 1221.
 
 IV. Attorneys' Fees
 
 61
 Plaintiffs brought this action under 42 U.S.C. § 1983. The district court awarded plaintiffs $4,442.50 in attorneys' fees. Under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, a district court has discretion to award "a reasonable attorney's fee" to "the prevailing party" in actions brought under certain civil rights statutes, one of which is section 1983, Simpson v. Weeks, 570 F.2d 240, 244 n. 4 (8th Cir. 1978).
 
 
 62
 The district court awarded plaintiffs attorneys' fees because they prevailed on their claim that the Missouri regulation is contrary to Title XIX, although the scope of relief was restricted under the court's interpretation of the Hyde Amendment. Citing Lund v. Affleck, 442 F.Supp. 1109, 1113 (D.R.I.1977), the district court decided that plaintiffs' lack of success below on their substantial constitutional claim was no bar to an award of attorneys' fees. We agree. See generally Kimbrough v. Arkansas Activities Association, 574 F.2d 423 (8th Cir. 1978).
 
 
 63
 The reasonableness of the district court's computation of the attorneys' fee is not disputed. Nor have defendants shown "special circumstances (that) would render such an award unjust." Wharton v. Knefel, 562 F.2d 550, 557 (8th Cir. 1977). Finally, we do not believe the district court abused its discretion in awarding attorneys' fees based on all of the plaintiffs' attorneys' work and not just on the substantial claim on which they were successful. See Brown v. Bathke, 588 F.2d 634, 638 (8th Cir. 1978).
 
 
 64
 Affirmed in part, reversed in part, remanded for injunctive relief in accord with this opinion.
 
 
 65
 McMANUS, District Judge, concurring in the result.
 
 
 66
 I concur in the majority's opinion affirming the trial court's award of attorney's fees. With respect to that portion of the opinion reversing the trial court on the merits of the abortion funding claim, I concur in the result but for different reasons.
 
 
 67
 First I am in agreement with the majority and the trial court that the Missouri regulation as written is inconsistent with Title XIX (Medicaid) as enacted. I do not agree that the Hyde Amendment (Hyde) is a substantive amendment of Medicaid, as the majority holds and as the trial court apparently held. In short, I view Hyde as having no effect on Medicaid. My reasons for so viewing Hyde have been stated in my dissent in our accompanying case of Hodgson v. Board of County Commissioners, 614 F.2d 601 (8th Cir. 1980) and need not be reiterated here. See also Preterm, Inc. v. Dukakis, 591 F.2d 121, 134-38 (1st Cir. 1979) (Bownes, J., dissenting); Planned Parenthood Affiliates v. Rhodes, 477 F.Supp. 529, 537-39 (S.D.Ohio 1979) (Kinneary, J., presiding); Doe v. Busbee, 471 F.Supp. 1326, 1332-34 (N.D.Ga.1979) (Murphy, J., presiding).
 
 
 68
 Furthermore, I am of the opinion that the ruling below should have been limited to holding that the Missouri regulation is void and unenforceable because inconsistent with Medicaid as enacted. I am of the view that the trial court exceeded its equitable discretion by judicially amending the state regulation to conform to Medicaid as supposedly affected by Hyde. Thus, in light of my view of the case and what should have been the limited holding below, I would reverse on that basis alone and see no need to reach the constitutionality of the state regulation.
 
 
 
 *
 The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation
 
 
 [1]
 The Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri
 
 
 [2]
 The Hyde Amendment then in effect forbade the use of federal funds for abortions except to save the woman's life, prevent severe and long-lasting physical health damage, or provide medical procedures necessary for the victims of rape or incest
 
 
 [3]
 See Mo.Ann.Stat. § 208.152 (Vernon Supp.1979); affidavit of Thomas E. Singleton, Deputy Director of Medical Services, Division of Family Services, ("I am directly responsible for the administration of Title XIX * * * for the State of Missouri.")
 
 
 [4]
 Defendants do not dispute that plaintiffs have standing to assert the third party rights of women seeking subsidized abortions. The Supreme Court settled this point in Singleton v. Wulff, 428 U.S. 106, 108, 112-18, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)
 
 
 [5]
 The affidavit of Dr. Ann E. Bannon, with which several physicians concur, states that "abortion is * * * bad medical practice. It is, in fact, an admission of the failure of medical practice. The deliberate killing of any patient born or unborn can never constitute good medical practice." While we respect the moral viewpoint that the assumptions in this statement reflect, we think it established beyond cavil that abortion is, in some instances, an appropriate medical procedure. See, e. g., Colautti v. Franklin, 439 U.S. 379, 398-400, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (physicians employ a variety of abortion methods); Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 77, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (use of saline amniocentesis as a method of abortion is an "accepted medical procedure" during and after first trimester of pregnancy); see generally Roe v. Wade, 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion decision and effectuation in first trimester of pregnancy to be "left to the medical judgment of the pregnant woman's attending physician")
 
 
 [6]
 We understand that a procedure is "medically necessary" if, in a physician's professional judgment, that procedure is in his patient's best medical interest. See generally Doe v. Bolton, 410 U.S. 179, 192, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). We further understand that "medically necessary abortion" and "therapeutic abortion" mean the same thing. Although one dictionary defines "therapeutic abortion" as "abortion induced when pregnancy constitutes a threat to the mother's life," Webster's New International Dictionary 2372 (3d ed. 1971), the legal definition, as developed by the Supreme Court, is broader, and makes "therapeutic" synonymous with "medically indicated," "medically necessary," and "non-elective." See, e. g., Poelker v. Doe, 432 U.S. 519, 519-20, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977); Maher v. Roe, 432 U.S. 464, 480, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); Beal v. Doe, 432 U.S. 438, 445, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977)
 
 
 [7]
 These assertions are made in the affidavit of Dr. Michael Freiman, with which several physicians concur. The opposing affidavit of Dr. Ann E. Bannon flatly rejects the assertion that abortion is medically necessary to treat drug addiction or to respond to a diagnosis of fetal deformity. The Bannon affidavit also disputes that abortion is medically appropriate where cardio-vascular problems or diabetes are involved. The Bannon affidavit acknowledges, however, that pregnancy complicates these conditions, and thus inferentially concedes that pregnancy termination might, in some instances, be in the pregnant patient's best medical interest. The Bannon affidavit also states that it is "almost always" improper medical practice to use abortion in connection with other treatment for genital cancer. For related medical opinion, see Zbaraz v. Quern, 469 F.Supp. 1212, 1220 (N.D.Ill.1979), review granted, juris. postponed, --- U.S. ----, 100 S.Ct. 447, 62 L.Ed.2d 374 (1979)
 
 
 [8]
 Defendants also argue that, because Title XIX endeavors to enable each state to provide medical assistance only "as far as practicable under the conditions of such State," 42 U.S.C. § 1396, Missouri has no obligation to subsidize abortions because conditions in Missouri made abortion subsidy politically impracticable. The contention that "political conditions" justify what is otherwise a violation of Title XIX is frivolous. Any violation of Title XIX could be so justified. The statutory language evidently recognizes a state's interest in fiscal integrity and administrative efficiency. It does not, in any event, excuse 13 C.S.R. § 40-80.100
 
 
 [9]
 Parallel to this argument is defendants' curious reliance on 42 U.S.C. § 1396a(f), an obscure provision which states that, with some exceptions, no state is required to aid the "aged, blind, or disabled" who would not have been eligible for medical assistance on January 1, 1972, but that some of these individuals may be deemed eligible. Because most abortions in Missouri were illegal in 1972, defendants conclude that subsection 1396a(f) excuses the restriction on abortion financing imposed by 13 C.S.R. § 40-81.100. This imaginative interpretation notwithstanding, both the express language of the subsection and its legislative history see H.R.Rep.No.92-231, 92d Cong., 2d Sess., reprinted in (1972) U.S.Code Cong. & Admin.News pp. 4989, 4992-93, 5014 reveal that the subsection is designed to encourage, but not require, the participating state to broaden its class of aged, blind, and disabled medical assistance recipients by providing that the federal government will make the supplemental payments. The subsection does not generally freeze a state's medicaid obligations at those extant in the period before January 1, 1972
 
 
 [10]
 The Hyde Amendment appeared in appropriations acts for fiscal years 1977-79; corresponding language in the appropriations act for fiscal year 1980 maintains the general proscription of abortion financing and differs from the language quoted in text only in that it contains no exception for abortions to prevent severe and long-lasting physical health damage. Act of Nov. 20, 1979, Pub.L.No.96-123, § 109
 
 
 [11]
 The district court did not rely on the rationale used in Preterm and Zbaraz. Rather, the court relied on 42 U.S.C. §§ 1396b(a) and 1396d(b) to hold that Title XIX absent, we suppose, some express indication to the contrary binds a participating state to subsidize only those medical procedures for which it will be reimbursed in accordance with the cost-sharing formula of Title XIX. The court thus held that the Hyde Amendment, by preventing reimbursement for non-Hyde Amendment abortions, automatically suspended any state obligation to subsidize these abortions. The parties' briefs did not discuss this novel interpretation, and we find it unnecessary to consider inasmuch as we affirm the district court's judgment on the basis of Hodgson
 
 
 [12]
 We also reject the suggestion that the substantive impact of the Hyde Amendment was determined in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). True, the Beal Court did acknowledge the existence of a version of the Hyde Amendment while upholding, on other grounds, a Pennsylvania medicaid program that subsidized only medically necessary abortions. Id. at 447 n. 14, 97 S.Ct. 2366 n. 14. Plaintiffs argue that this disposition of the case demonstrates that the Hyde Amendment is not a substantive enactment. If it were, plaintiffs contend, the Court would have relied on it to uphold the Pennsylvania program. The Court's failure to do so, plaintiffs continue, means that the Hyde Amendment does not relieve states of their Title XIX obligations. One answer to this argument is that any holding that is not explained explicitly but is only arguably implicit in a decision can have but little precedential value. Further, and more fundamental, we do not think the Court's disposition in Beal necessarily implies that the Hyde Amendment has no substantive effect. The Court's decision not to rely on the Hyde Amendment as a ground for its decision does not mean that the Hyde Amendment would not have been an appropriate ground. In choosing the ground that it did, the Court chose but one of the available alternatives
 
 
 [13]
 The Supreme Court has agreed to hear, some months hence, appeals from Zbaraz that will raise the question whether the Hyde Amendment's restrictions on abortion financing are constitutional. We nonetheless proceed with this case because it is not certain that the Court will reach that issue, for it is not clear that the constitutionality of the Hyde Amendment was properly before the court in Zbaraz. Although the Zbaraz court permitted the United States to intervene and defend the Hyde Amendment's constitutionality, the court was not persuaded that the issue was squarely before it, and addressed the issue only because it was under the Seventh Circuit's mandate to do so. Zbaraz v. Quern, supra, 469 F.Supp. at 1215 n. 3
 Our own constitutional holding, of course, does not touch the Hyde Amendment because the plaintiffs have not attacked it and because the United States is not a party, see 28 U.S.C. § 2403(a). We do acknowledge, however, that our judgment of the constitutionality of a Missouri statutory scheme paralleling the Hyde Amendment suggests what our judgment of the Hyde Amendment would be, were it properly before us.
 
 
 [14]
 Of course, still other classifications are possible. See, e. g., Butler, The Right to Medicaid Payment for Abortion, 28 Hast.L.J. 931, 946-51 (1977) (classification among women seeking abortion, classification based on wealth)
 
 
 [15]
 Plaintiffs' challenge, arising under the Equal Protection Clause of the fourteenth amendment, might also be put in terms of the Due Process Clause of that amendment. Due process and equal protection analyses are sometimes interchangeable. Compare Zablocki v. Redhail, 434 U.S. 374, 388-91, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (invalidating restriction on freedom to marry of certain indigent fathers on equal protection rationale with id. at 392-96, 98 S.Ct. 673 (Stewart, J., concurring) (due process is preferred mode of analysis where, as here, problem concerns not discriminatory classifications but unwarranted encroachment on constitutionally protected freedom); compare Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-48, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (invalidating mandatory maternity leave policy on due process rationale) with id. at 651-57, 94 S.Ct. 791 (Powell, J., concurring) (equal protection is the appropriate frame of reference where, as here, problem is one of irrational classification). We will follow the lead of the Supreme Court in Maher v. Roe, supra, and examine this problem of abortion financing in terms of equal protection. We believe the equal protection analysis is flexible enough to accommodate plaintiffs' due process concerns. Accord, Zbaraz v. Quern, 469 F.Supp. at 1216 n. 5. On appeal, plaintiffs do not press their arguments that the Missouri policy imposes cruel and unusual punishment on indigent women under the eighth amendment, deprives the physician-plaintiffs of their right to practice medicine under the first, fourth, fifth, ninth and fourteenth amendments, and is unconstitutionally vague and thus violative of due process. The district court summarily ruled that these and related constitutional claims were without merit. We have no occasion to address them here
 
 
 [16]
 Wade, of course, is a due process rather than an equal protection case, but provides a framework for deciding whether a state policy impinges upon a woman's fundamental interest in choosing abortion. Maher v. Roe, supra, 432 U.S. at 471-74, 97 S.Ct. 2376
 
 
 [17]
 See e. g., Roe v. Wade, supra, 410 U.S. at 213, 93 S.Ct. at 758 (Douglas, J., concurring) (among fundamental rights protected by the Constitution is "the freedom to care for one's health and person"); see generally Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (Constitution implicitly protects "interest and independence in making certain kinds of important decisions")
 
 
 [18]
 In examining the impact of Missouri's medicaid exclusion, we are not relying simply on the denial of benefits for medically necessary abortions; there is no constitutional right to a state-financed abortion. Rather, we are relying on that denial coupled with Missouri's subsidy of the alternative activity of continuing the pregnancy to term; there is a constitutional right to seek a medically necessary abortion and also, we presume, to seek to preserve one's health without undue governmental influence
 
 
 [19]
 The Maher Court acknowledged that "a state-created obstacle need not be absolute to be impermissible," 432 U.S. at 473, 97 S.Ct. at 2382, and that the constitutionality of an abortion-non-abortion distinction "will depend (in part) upon its degree," id. (quoting Bellotti v. Baird, 428 U.S. 132, 147, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)) (emphasis added)
 
 
 [20]
 Defendants do not assert Missouri's interest in shepherding limited funds, see Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), or in increasing its population growth, see Maher v. Roe, supra, 432 U.S. at 478 n.11, 97 S.Ct. 2376 . We think it apparent that neither interest is implicated here. Missouri's fiscal interest is not implicated because the state's choice of financing childbirth and refusing to finance abortion is, by nearly every indication, more expensive than the alternative of financing both. See Hodgson v. Board of County Commissioners, 614 F.2d 601, 610, n.16 (8th Cir. 1979); but see D. R. v. Mitchell, supra, 456 F.Supp. at 618-19. Nor can Missouri persuasively claim that it has an interest in promoting its population growth in light of its provision of family planning services and supplies. Mo.Ann.Stat. § 208.152(13) (Vernon Supp.1979)
 
 
 [21]
 The most recent version of the Hyde Amendment relieves Missouri of any obligation to subsidize abortions to prevent severe and long-lasting physical health damage. See note 10 supra
 Although defendants do not raise the point on appeal, we note there is some controversy whether the Hyde Amendment permits funding of medically necessary abortions in cases of rape or incest. The Amendment permits funding for "such medical procedures necessary for the victims of rape or incest" but does not specify "abortion" funding for these victims, as it does in the case of women whose lives would be endangered by a continued pregnancy. In an amicus brief filed before the district court, HEW cited an opinion letter of the United States Attorney General, dated July 27, 1977, which interpreted an earlier version of the Hyde Amendment to authorize only those procedures that occur immediately after the incident, and not to encompass abortions in the conventional sense.
 Courts that have spoken to the question, however, have concluded that "such medical procedures necessary" includes abortions. E. g., Zbaraz v. Quern, supra, 596 F.2d at 199 n. 7; Preterm, Inc. v. Dukakis, supra, 591 F.2d at 127. The words of the Amendment support this interpretation. The Amendment first proscribes abortion funding generally and then excepts, inter alia, "medical procedures necessary" to treat victims of rape or incest. This phrase would include contemporaneous medical treatment that would prevent or terminate pregnancy, as the Attorney General suggests. This phrase would also include, if it is used in the commonly accepted sense, an abortion when an abortion is a medically necessary procedure, as it sometimes is. See notes 5 and 6 supra. Our interpretation is strengthened by other language in the Amendment, which provides that federal funds may be expended in the case of rape or incest only if the incident is "reported promptly to a law enforcement agency or public health service." This language contemplates that some medically necessary procedures would occur some time after the rape or incest and not be virtually contemporaneous with it. Otherwise there would seem no need for a prompt reporting requirement to ensure that claims of rape or incest are genuine.
 
 
 [22]
 We reject defendants' contention that the Missouri subsidy scheme is squarely supported by the Supreme Court's per curiam decision in Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). True, the plaintiff in Poelker did suffer from fibroid tumors and polyps, an extremely retroverted uterus, and trichomycosis. Doe v. Poelker, 515 F.2d 541, 543 (8th Cir. 1975). And the defendant, the mayor of St. Louis, did declare that abortion was contrary to the public policy of Missouri and St. Louis except where necessary "to save the mother from grave physiological injury or death." Id. at 547 n. 8
 Nevertheless, the Supreme Court did not consider the case as presenting a challenge to a government benefit scheme that excludes therapeutic abortions. Despite plaintiff's condition, the physicians who examined her found no medical reason to justify an abortion. Id. at 543. Plaintiff's desired abortion was therefore termed as "non-therapeutic" by both this court, id. at 545, and the Supreme Court, 432 U.S. at 521, 97 S.Ct. 2391. The Supreme Court's decision did not mention St. Louis' "grave physiological injury or death" standard, presumably because the plaintiff would have been denied access to the hospital facilities even under the more relaxed standard employed by the Connecticut medicaid scheme under review in Maher v. Roe, supra. The limited purpose of the Court's three page opinion in Poelker was to demonstrate that Maher's approval of withholding medicaid subsidies for non-therapeutic abortions also applies to a city's denial of hospital facilities. The Court explained, "(f) or the reasons set forth in our opinion in (Maher ), we find no constitutional violation by the City of St. Louis in electing, as a policy choice, to provide publicly financed hospital services for childbirth without providing corresponding services for non-therapeutic abortions." 432 U.S. at 521, 97 S.Ct. at 2392. The Court thereby gave no approval to a scheme that would discriminate against "therapeutic abortions," as the Court has defined them, see note 6 supra.
 
 
 [23]
 Although the logical relevance of the viable/non-viable distinction to the weight of the state's interest in protecting fetal life is not clear, see, e. g., L. Tribe, American Constitutional Law 927 (1978); Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 924-25 (1973), it is obviously authoritative for the purpose of determining when the state's interests in protecting fetal life outweighs the woman's interest in choosing abortion. We find no support for the Zbaraz court's conclusion that this distinction also determines the point at which a state's interests in protecting fetal life surpasses its interest in maternal health and thus becomes legitimate for purposes of promoting fetal life at the expense of maternal health. That the interest in fetal life somehow becomes stronger at viability does not necessarily mean that it thus surpasses in importance a competing interest in maternal health, which is also growing in substantiality as the pregnancy approaches term. Roe v. Wade, supra, 410 U.S. at 162-63, 93 S.Ct. 705
 
 
 [24]
 For indications of the Court's understanding of that term, see note 6 supra and cases cited